**CARTER–WALLACE, INC., Plaintiff,**

v.

**RIVERTON LABORATORIES, INC., Defendant.**

**Civ. A. No. 65–4.**

United States District Court
S. D. New York.

Oct. 2, 1969.

Morgan, Finnegan, Durham & Pine, New York City, for plaintiff. George B. Finnegan, Jr., William D. Denson, John D. Foley, William C. Sigerson, New York City, of counsel.

John P. Chandler, New York City, for defendant. Zachary T. Wobensmith, II, Zachary T. Wobensmith, III, Philadelphia, Pa., of counsel.

CANNELLA, District Judge.

The plaintiff, Carter-Wallace, Inc. ("Carter-Wallace"), instituted this action for infringement of U. S. Patent No. 2,-724,720 issued to its predecessor, Carter Products, Inc., on November 22, 1955. The patent relates to certain organic compounds useful in the treatment of disorders of the central nervous system. Claim 4 of the patent in issue covers the compound 2–methyl–2–n–propyl–1, 3–propanediol dicarbamate, a substance otherwise known as meprobamate. This compound has been marketed as an ethical drug [1] under certain trade names, of which "Miltown" and "Equanil" are the most common. The validity of the plaintiff's patent on meprobamate is challenged by the defendant, Riverton Laboratories ("Riverton"). The latter has produced the patented compound and has sold it under its generic designation of meprobamate. Prior to the trial of this case, Riverton conceded that it "has infringed claim 4 of the United States Patent No. 2,724,720 by making and selling meprobamate tablets, provided the court further finds said patent to be valid and enforceable." [2] It has thus narrowed

---

1. An ethical drug is one which may be sold only when directed by a doctor's prescription.

2. Pre-Trial Order, para. 3A(vi), dated March 1, 1968. This concession also obviates any necessity to discuss paragraph E 2 of the defendant's Answer which denies infringement. The court also notes the abandonment of the defenses asserted in paras. 9(a) through 9(d), inclusive, of the Answer. See Pre-Trial Order, para. 2A.

the issues before this court to the questions of the validity and the enforceability of the patent in suit.

The defendant raised certain defenses in its pleadings which can be summarized as follows:

1) That the patent in suit is invalid due to fraud practiced upon the Patent Office during the pendency of the patent application;[3]

2) That the patent is unenforceable due to false and misleading representations made to the public constituting a misuse of the patent privilege and unclean hands on the part of the plaintiff;

3) That the plaintiff used its patent to extend its lawful monopoly to certain unpatented materials;[4] and

4) That the plaintiff used its patent to lessen competition by allegedly interfering with the defendant's performance of government contracts.

This summarization of defenses does not encompass all the matters raised before the court, but it does serve to frame the questions presented so that a determination of the fundamental issues may be initially presented.

■ The Court finds that the patent in suit is valid, enforceable and infringed and that the plaintiff is entitled to judgment in this case. After examination and consideration of all relevant matters of fact and law, the court finds that the defendant has failed to sustain its burden of establishing that the patent was procured by fraud upon the Patent Office and thus overcome the *prima facie* validity of the patent in suit. Further, the defendant has failed to prove that the plaintiff engaged in activities which would constitute interference with its

performance of government contracts and that this failure of proof requires dismissal of this defense to the enforcement of the patent. The court further finds, as the defendant concedes,[5] that the record is devoid of any evidence which could justify the court in finding that the plaintiff committed a fraud on the public or extended its monopoly to unpatented materials.[6]

Therefore, the counterclaim of the defendant is dismissed as are its defenses and the court directs that judgment be entered for the plaintiff, including its right to damages, injunctive relief and an accounting. The plaintiff's demands for punitive damages and attorneys' fees are denied.

The court finds that it has jurisdiction of both the parties to, and the subject matter of, this action and that venue is properly laid in this district. 28 U.S.C. §§ 1338(a), 1400(b) (1964 ed.); Purer & Company v. Aktiebolaget Addo, 410 F.2d 871 (9th Cir. 1969); Pre-Trial Order, para. 3A (iii).

Prior to the trial of this action by the court, sitting without a jury, the matter of plaintiff's motion to strike certain defenses asserted by Riverton was denied. The hearing on the motion had been deferred to the trial judge and, after argument, this court denied the motion. Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 47 F.R.D. 366 (S.D.N.Y. 1969). The plaintiff had attacked the defenses summarized above as insufficient in law and had moved that they be stricken from the pleadings prior to the trial of the action.

The denial of that motion and the dismissal of the same defenses herein might be construed on the surface as in-

---

3. Riverton concedes that the patent is valid if not procured by fraud and asserts other defenses which go only to the question of the enforceability of the patent against it.

4. The defendant's position is that the monopoly is lawful only if the defense of fraud on the Patent Office is defeated, for only then does it concede the validity of the patent.

5. Brief For Defendant Sur Pleadings and Proofs, p. 38.

6. The defendant has expressly abandoned this defense, recognizing its failure to connect any activities on the part of the plaintiff with its inability to secure unpatented materials used in the manufacture of meprobamate. See Brief For Defendant Sur Pleadings and Proofs, p. 38.

consistent. But the rationale for the determination on the motion was clear— that the defendant be given the opportunity to prove its defenses at trial and that to deny it this chance prior to trial would be improper. In addition, the Court determined that certain questions, such as the effect of Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966), on the matters in issue, be better left for discussion after trial. The court has no intention of delineating its decision on the motion within this opinion. It is only appropriate however, to note the seeming inconsistency of holding the defenses sufficient as a matter of law *prior* to trial and dismissal of these defenses *after* trial and to reiterate that the court gave the defendant every opportunity to sustain its defenses by adequate proof. The court finds that the defendant has not done so.

The patent in suit was issued on November 22, 1955 to Carter Products, Inc. upon the application of Frank M. Berger and Bernard J. Ludwig. The application was first filed on July 29, 1950 by the patentees and thereafter a continuation-in-part application was filed on August 3, 1953. This latter application matured into the patent in suit. Claim 4 of the patent is that meprobamate is a substance which possesses certain anticonvulsant properties and also can produce a marked paralyzing action on voluntary muscles when administered in certain dosages. The applications furnished to the Patent Office disclosed that certain tests had been performed on laboratory animals, with stated results, that the compound was similar in reaction to maphenesin, a drug used at the time of the applications (1950–1955), but that it possessed properties which made it more effective and of longer duration in the treatment of muscle spasm, anxiety and other disorders of the nervous system. Based upon the information furnished to the Patent Office, the patent issued to Carter Products, Inc. On December 9, 1954, Dr. Frank M. Berger filed a new drug application with the Food and Drug Administration ("F.

D.A."), an application which contained all the pharmacological and chemical data on meprobamate available at that time. Based upon fulfillment of its requirements, the F.D.A. granted the application on April 28, 1955, and the first sale of the substance was made on May 9, 1955.

Meprobamate was marketed as an ethical drug by the plaintiff for it was Dr. Berger's conclusion concurred in by the F.D.A., that use of the drug should be initiated and supervised by a physician. The plaintiff sold the substance under certain brand or trade names while the defendant, when it began to sell meprobamate, did so by marketing it as a generic drug, without the use of trade names. The court is of course aware that for some time the ethics and economics of the use of trade names in the sale of generic drugs has been the source of a great deal of discussion, some dispute and suggestions for proposed regulation. However interesting this area may be, it is not truly an issue in the case at bar. The defendant does not attempt to justify any of its actions by resort to a claim that its sale of meprobamate as a generic drug is of aid to the public at large *per se* or that this course of action was followed for reasons other than sale of the product to the government. While the temptation to comment on this important question is a great one, the court will refrain from injecting such an issue into the matters before it.

Another matter of recent nation-wide attention does bear some relation, however tangential, to the issue presented by the defendant in its claim of fraud by the patentee in its application to the Patent Office. Although the matter will be explored in some detail *infra*, it can be stated at this juncture that Drs. Berger and Ludwig presented statistical and pharmacological information on meprobamate to the Patent Office based upon tests performed on laboratory animals. Human statistical information was neither provided nor requested. At a later time, the F.D.A. granted a new drug application made by Dr. Berger based upon a broader range of information in-

cluding tests on humans. Of late, the testing procedures for new drugs has come under close scrutiny with some reports that information provided to the F.D.A. has been both inadequate and in some instances may be inaccurate. While such emphasis by the national media on new drugs and their controls brings to mind the still evident consequences of the thalidomide controversy, this issue is also not squarely before the court. Neither the defendant in asserting its rights, nor the court in protecting the public interest found it necessary to delve into F.D.A. procedures for granting new drug applications except insofar as that matter related to the background of the case and the intent of the patentees. The grant of such new drug application is not in issue; the issuance of the patent certainly is. Thus, the concern which all of us possess toward the proper regulation of the drug industry is only present here in the broadest sense for the facts which will be discussed relate to the manner in which a chemical compound is tested for the first time and how it was done in this case. The ensuing discussion will then serve as a sufficient basis for a determination of the propriety of the conduct of the patentees before the Patent Office.[7] Furthermore, the following discussion of the evidence presented to the court will be useful in an analysis of the other defenses asserted by Riverton.[8]

The parties stipulated that a number of facts are not in dispute. The plaintiff, a Maryland corporation, is the owner of United States Patent 2,724,720 and is entitled to maintain this action for infringement against the defendant, a New York corporation. As previously stated, the defendant conceded its infringement of claim 4 of the patent should it be found to be valid and enforceable. This latter concession materially lightened the plaintiff's burden in the action and as part of its case in chief, it introduced into evidence the patent in suit.[9]

In order to attempt to overcome the *prima facie* validity of the patent and meet its burden of establishing that the patent issued by virtue of a fraud on the Patent Office, the defendant presented evidence to demonstrate the method for evaluation of materials for therapeutic use. Dr. Walter M. Booker, a cellular physicist and biochemist, testified for the defendant. Dr. Booker is the head of the pharmacological department at the Howard University Medical School and has served in this capacity since 1953. He holds the rank of full professor there. In his evaluation of materials, certain steps are involved. After a determination of the solubility of a material is made, its structure is examined and an attempt is made to compare or relate the substance under test to some known substance. If no information of this kind is available a blind test will be performed, with Dr. Booker's preference for an initial test animal being a dog. With the animal unconscious, the substance will be administered, the method varying according to the reactions sought. The vital bodily functions of the animal, i. e., blood pressure and respiration, are then checked. These initial tests, which may be run on different laboratory animals (rats, rabbits, mice, dogs and monkeys) for a possible variance in reactions, are catalogued in an effort to determine the limits of toxicity. These toxicity tests will result in a determination of the lethal dose of the substance as well as its effective dose. If these two indicators are too close, the therapeutic value of the substance may be limited or nil. The principles involved may be called the margin of safety or the therapeutic ratio. At the time acute toxicity tests

---

7. The defendant does not claim that the new drug application should not have issued or that the drug is dangerous when used under a physician's supervision.

8. There will be no special attempt to focus on those facts which relate to the questions of fraud on the public (misuse of the patent privilege/unclean hands) or extension of the patent to unpatented materials. Some of the facts, however, are useful in the general framework of this case.

9. Plaintiff's Exhibit 1.

are being conducted, the daily doses of the substance are administered and observations are made as to weight, urinalysis, water intake and the various chronic toxicity studies. At this juncture, the question of tolerance is also examined. If no great tolerance is observed, human experimentation may be possible. Certain studies in humans then precede application to the Food and Drug Administration for approval as a new drug. During all tests, no matter where conducted, reports of side effects, other untoward reactions and additional information will be exchanged. All current and relevant information is then transmitted to the proper agency, either the Patent Office or the F.D.A.

Dr. Booker's description of the manner of testing new chemical compounds, particularly those with suspected therapeutic value, was of interest to the court as a framework for the testimony of Dr. Berger who was examined at length both on the propriety of certain testing methods and on his own actions and knowledge during the pendency of the patent application. Two observations can be made at this point. It is important to remember that the description of the type and quantity of chemical testing conducted by the patentees relates to the period in the early 1950's. Not only must their actions be so evaluated, but the matter of what was required or accepted by the Patent Office at that time is also important. Secondly, Dr. Booker did not attempt to provide the court with a statement of Patent Office or F.D.A. requirements or to settle the matter of a substance's utility for patent purposes, a subject for later discussion. Dr. Booker's expertise was evident and of value to the court in determining the central issue of fact in the case—whether the patentees withheld any relevant information from the Patent Office, provided it with any false or misleading information or committed or omitted any acts which would compromise their duty of full disclosure to the Patent Office.

Dr. Frank M. Berger, one of the patentees and a renowned pharmacologist, was called as a witness by the defendant. Admittedly, this placed an additional burden on Riverton in attempting to establish fraud out of the alleged perpetrator's mouth. However, the Court found Dr. Berger to be a basically truthful, albeit proud, individual, and in the main accepts his factual testimony.

Dr. Berger stated that he received his medical degree in Prague, Czeckoslavakia. From 1938 to 1941, he was in England working on penicillin. At the same time, he also taught in a medical school there. In 1943, he was a bacteriologist at the University of Leeds, and in 1945 he joined the British Drug Houses, Ltd. in London. In 1947, he was made the head of their department of pharmacology. While working on penicillin, he discovered the drug mephenesin. After his discovery, tests were conducted by him and by other chemists and subsequently the English firm applied to patent the substance.[10] In 1947, Dr. Berger came to the United States as an assistant professor in pediatrics in Rochester, New York where he remained until 1949. In that year, he joined the plaintiff corporation and became a director of research. His functions included the evaluation of chemical materials for their therapeutic values. He was searching for a drug which would possess the qualities of mephenesin, but would have a longer effective duration.

Dr. Berger described the considerations of organic chemistry which served as a basis for his further experimentation in this area. He published these findings in 1946 and indicated as early as 1949 that if such a substance could be found, it could have therapeutic value in humans. His colleague Dr. Ludwig was the first researcher to synthesize meprobamate in 1950. The anti-convulsive properties of the substance were tested on mice and the length of its effect was compared to mephenesin and a paralytic action was also noticed. At a later time, the Patent

10. No patent on the substance was obtained in the United States.

Office called the patentees attention to certain experiments being conducted by other researchers and asked that comparisons be made. This was done and the information furnished to the Patent Office.[11]

The pharmacological studies on the substance were commenced in 1951 and tests were made on several species of laboratory animals such as mice, cats, dogs, monkeys and rats with the object of observation of the reaction in these various animals. The initial tests after Ludwig's first synthesis were made on mice and the anti-convulsant properties of the compound were established. Tests were also made on rats which provided information on paralytic actions. Central nervous system tests were also conducted at this time.

In 1952, certain tests were conducted on rabbits and mice. From the information acquired by the patentees, they determined that meprobamate did not affect fertility, there were no malformations and both the death rate and the lacticity of the rats was in a satisfactory range. In 1953, all mice tests were finished and other animals were used as subjects. Dr. Berger found that the neurological symptoms were the same in monkeys as in rats and mice. Through 1955, tests of a similar nature were conducted on dogs and cats.

It appears that after the chronic toxicity tests were made and became available in 1952 and 1953, tests were begun on humans which were divided into three phases.[12] These tests, conducted by many physicians and testing facilities, provided a great deal of information, resulted in published studies on the drug and provided the basis for the new drug application made to the F.D.A. Certain side effects were found, although none severe enough to challenge the drug's safety.[13] Not all of the tests conducted by Dr. Berger and others were furnished to the Patent Office and no tests on humans were submitted. As of the time of the filing of the continuation-in-part application in 1953, only phase one tests had been completed on humans.

Without detailing the remainder of Dr. Berger's testimony, it can be said that the record is replete with evidence of the many publications of tests which occurred while the patent and new drug applications were pending. From the fact that the patentees did not furnish all such information to the Patent Office, nor provide it with human data, the defendant characterizes the conduct of the patentees as that of concealing information, misrepresenting the status of tests, and lacking in candor and forthrightness. The thrust of this argument is that Dr. Berger knew he would use, or attempt to use, meprobamate as a drug for humans and his failure to unequivocally so state and provide information to support this renders his conduct fraudulent. Were the facts presented to the court considered in a vacuum, there might be a semblance of logic in such an approach. But it is evident to the court that the patentees made no attempt to conceal information, did not misrepresent, distort or falsify data furnished, nor falsely answer any

11. Apparently no other requests for information were made by the Patent Office, nor is there any indication that the special inquiry made by the Patent Office was answered in a false or misleading way. Cf. Charles Pfizer & Co., Inc. v. Federal Trade Commission, 401 F.2d 574 (6th Cir. 1968), cert. denied, 394 U.S. 920, 89 S.Ct. 1195, 22 L.Ed.2d 453 (1969).

12. Phase one tests are designed to establish tolerance, lack of toxicity and safety; phase two is to establish clinical effectiveness through repeated uses; and phase three is concerned with the addictive qualities of the drug.

13. Meprobamate under its various trade names is packaged in tablets and distributed through wholesalers after it is labeled and the quality approved by the F.D.A. There is an insert included in the package and it contains up-to-date information on the drug, the recommended dosage and possible side effects. A sample insert was introduced into evidence as Defendant's Exhibit M.

inquiry made to them. While the argument can be made that there was a duty to provide human test information as a matter of law, discussed below, it is unfair to characterize the conduct of the patentees as other than truthful. Further, while the defendant correctly points out that the Patent Office maintains no testing facilities, it does not follow that technical expertise is lacking. The very test comparisons requested here demonstrate the lack of naiveté possessed by the patent examiner. Considered in light of the knowledge possessed by those skilled in the art here involved, the court finds that the patentees did not factually misrepresent facts to the Patent Office, nor omit data unfavorable to their cause. In addition, there is no evidence to support a finding of any fraudulent intent on the part of the patentees.

Dr. Berger included all information on human testing in his new drug application to the F.D.A. This application was submitted on December 9, 1954 and approved by the F.D.A. on April 28, 1955. This approval followed a review of both the safety of the drug and the information to be included on its label. Furthermore, Dr. Berger made a medical judgment that the drug should be a prescription or ethical drug due to the nature of the people to be treated and the characteristics of the drug.[14]

Dr. Berger's explanation of his presentation of material to the Patent Office clearly indicates those matters he felt were material. That is he sought to establish that the substance was new and possessed a longer duration than its predecessor mephenesin. These matters were clearly covered in the patent. Dr. Berger further testified that he set forth the best mode known to him of use of his compound at the time the application was filed. The patent also states that the compound may be of therapeutic value and there is nothing in the record to indicate that this statement was false or misleading when made. No positive representation of such use could have been made at that time.

The retail sale of meprobamate under its trade names was a marked success. Countless patients have made use of the drug under the care and direction of a physician. The sale of this drug has obviously been of great economic benefit to the plaintiff, and the maintenance of its monopoly uninfringed a matter of prime concern to it. The court now turns to a discussion of the defendant's activities in their production of meprobamate and the problems which befell them in this venture.

The defendant corporation was organized around 1958 and offers analytical services for pharmaceutical houses. It also provides clinical analyses for doctors. Dr. Clifford Davis is the president of the corporation, and he testified that the defendant produced meprobamate and also that *circa* 1960 the defendant became aware of the fact that Carter-Wallace possessed a patent on the substance. He testified that Riverton manufactured meprobamate for the fulfillment of certain government contracts into which it entered.[15] He then proceeded to describe the various contracts and some problems the defendant met in an attempt to fulfill them.

In order to complete its contracts, the defendant had to purchase propanediol, an ingredient, from outside sup-

---

14. In 1955, the drug was intended for three groups of patients: 1) persons suffering from anxiety and tension; 2) persons suffering from petit mal epilepsy; and 3) persons suffering from muscle spasms, e. g. cerebral palsy and multiple scelerosis.

15. If manufacture of a patented substance is for the United States, the remedy of the patent owner lies in suit against the United States in the Court of Claims. 28 U.S.C. § 1498 (1964 ed.). Such infringement may not be the subject of a suit against the private concern involved.

pliers.[16] In addition, the defendant could not entablet its preparation and contracted this function to companies who did such work. As an example of this latter function, the defendant contracted with Strong, Cobb, Arner ("SCA") to entablet meprobamate for them. This company failed to entablet the substance for a certain government contract and this agreement with the Defense Supply Agency was not fulfilled. As a penalty the Veterans Administration took Riverton off its qualified buyers list. The defendant has been reinstated on this list as of February 3, 1969. SCA had entableted for the defendant on other occasions. Riverton seeks to have an inference drawn that the plaintiff was improperly responsible for the entabletor's failure to fulfill its contract with the defendant. If such an inference could be drawn, it might rise to the level of a knowing interference with a government contract, an anti-trust violation even though the patent be valid. However, the record does not contain that character of evidence from which the court could reasonably draw such an inference as to this contract or other entableting agreements entered into by the defendant.[17] Moreover, there is strong evidence that other considerations caused a breakdown in the relationship between Riverton and SCA. In 1965, the defendant demanded an accounting from SCA of all powder delivered to them. Although a certain theoretical loss is expected during the entableting process, the loss involved here was much more extensive. The parties never successfully resolved their dispute as to the missing powder. Furthermore, in March of 1966, the F.D.A. confiscated some of the meprobamate powder produced by the defendant on the grounds that some of it was adulterated and inadequate records were being kept. These two incidents are indicative of the state of the record. No connection with any improper actions of the plaintiff is demonstrated for the defendant's sub-contractual failures and other more plausible explanations are present.

The same rationale is applicable to the defendant's claim that the plaintiff prevented it from obtaining propanediol, a necessary ingredient for the manufacture of meprobamate. While Riverton concedes it has failed to prove that Carter-Wallace extended its monopoly to non-patented material, i.e. propanediol, it presses the issue of interference with government contracts relating to the same substance. But the deficiency of proof is the same. While there is evidence that Union Carbide declined to sell a component in the manufacture of propanediol[18] to the defendant without an agreement to indemnify Union Carbide for any possible charge of contributory infringement of the plaintiff's patent, there quite simply is no evidence to connect the plaintiff with Union Carbide's actions in this regard. The same is true of the defendant's attempt to demonstrate interference with other suppliers. While there is proof of the problems encountered by Riverton, there is no proof that the plaintiff was in any way connected to these incidents. The court cannot speculate on the reasons for these difficulties for many explanations can be supplied. Suffice it to say that the court finds the defendant has failed to establish any factual connection with its supplier/entabletor contractual failures.

In addition to the testimony and other evidence discussed above, the parties entered into evidence documentation in the areas in question. The court has carefully examined these documents, including the patent applications, the new

16. The defendant did not begin to produce propanediol until 1965.

17. The defendant used various companies to entablet for them. Strong, Cobb, Arner was selected for discussion as a representative company with whom difficulties arose.

18. The component was 2-methyl pentaldehyde.

drug application and the various technical publications presented. Nothing contained within them works a change in the facts already discussed. In minute detail these documents provide support for the testimonial evidence of the various witnesses and the conclusions stated above.

██ When confronted with the defenses asserted by the defendant, particularly insofar as anti-trust implications are concerned, it might be well to initially set forth exactly what a patent consists of and the extent of its grant. For to understand what it is, and just as importantly what it is not, will be valuable when discussing various segments of patent law involved in this case.

A patent is a grant of the right to exclude others from making, using, or selling one's invention * * *. It is a legitimate monopoly having as its primary purpose the advancement of the arts and sciences rather than reward to the individual. It is not a certificate of merit, but an incentive to disclosure. Valmont Industries, Inc. v. Yuma Manufacturing Company, 296 F.Supp. 1291, 1294 (D. Colo.1969).

This summary of the patent privilege and the reason for its existence leads to the concept of enforcement of this right. Recognizing that the patentee is granted this exclusive right insofar as his invention is concerned, the "heart of [this] legal monopoly is the right to invoke the State's power to prevent others from utilizing his discovery without his consent." Zenith Radio Corp. v. Hazeltine Research, Inc., 395 U.S. 100, 135, 89 S.Ct. 1562, 1583, 23 L.Ed. 2d 129 (1969). It is thus the interest of the public in the disclosure of new and useful inventions that causes a monopolistic grant to be given to the inventor.

██ No discussion of the rights of the patentee and the issues between litigants such as those in the case at bar can ever ignore the paramount public interest which is present in every patent case. This is so whether the patentee seeks to enforce his grant or another interested party attempts to invalidate the patent right. The Supreme Court has not only recognized this public interest, but has provided instruction on its proper place in the patent picture. In Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., the court stated:

> The possession and assertion of patent rights are 'issues of great moment to the public.' A patent by its very nature is affected with a public interest. * * * At the same time, a patent is an exception to the general rule against monopolies and to the right to access to a free and open market. The far-reaching social and economic consequences of a patent, therefore, give the public a paramount interest in seeing that patent monopolies spring from backgrounds free from fraud or other inequitable conduct and that such monopolies are kept within their legitimate scope. (Citations omitted.) 324 U.S. 806, 815–816, 65 S.Ct. 993, 998, 89 L.Ed. 1381 (1945).

This statement frames the broad issues before this court. A patent has been issued after consideration by the Patent Office, the agency charged by law with providing expert analysis of the applications for patents. The resultant monopoly obtained by the plaintiff must be legitimate in scope and must not only be free from fraud, but also be that type of idea which merits patent protection. Lear, Inc. v. Adkins, 395 U.S. 653, 656, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969). If all criteria for patentability are not met, the public interest will not be served. See Edward Katzinger Co. v. Chicago Metallic Manufacturing Co., 329 U.S. 394, 67 S.Ct. 416, 91 L.Ed. 374 (1947).

One other preliminary matter must be considered. The patented material in the case at bar is a chemical substance which has been used extensively as a drug or medicine. In the context

of the patentees' knowledge of potential use of the invention at the time of the patent applications, the question of whether the Patent Office should become involved in an analysis of the safety of the drug is present.[19] Placed in balance, does a drug possess patent utility if it is not safe? Or will usefulness in other areas with potential for human therapeutic value suffice?

■ The requirements for the patenting of an invention are set out in 35 U.S.C. § 101 (1964 ed.). In substance, the statute provides that the item to be patented must possess the qualities of novelty, invention and utility. See Panduit Corporation v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435 (W.D.Mich.1969). In this case, the defendant has conceded that the first two qualities were present and thus no question of the prior art is involved. Riverton does challenge the utility of meprobamate and asserts that as a matter of law no showing of utility was made to the Patent Office for no tests on human beings were submitted, a requirement the defendant claims exists.[20] Its rationale appears to be that since the substance was intended for "exclusive" use on humans, no utility could have been demonstrated without human test data. Plaintiff claims that the compound possessed utility even without its *potential* value for humans and was

thus entitled to the patent upon the information submitted.

■ This brings the question of the validity of the patent into play. The fact of the issuance of the patent in suit to the plaintiff provides a statutory *prima facie* validity to the patent. 35 U.S.C. § 282 (1964 ed.). This presumption of validity "relieves the patent holder of the burden of establishing that validity as a requisite for the successful maintenance of an infringement action, * * *."[21] Furthermore, the *prima facie* validity of the patent places the burden of proving the invalidity of the patent upon the defendant. As the Supreme Court expressed it in Radio Corporation of America v. Radio Engineering Laboratories, Inc.:

> A patent regularly issued * * * is presumed to be valid until the presumption has been overcome by convincing evidence of error. * * * one otherwise an infringer who assails the validity of a patent fair upon its face bears a heavy burden of persuasion, and fails unless his evidence has more than a dubious preponderance. 293 U.S. 1, 7–8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934).

The interpretation placed on this statement by the Supreme Court is that the burden is on the infringer to prove by clear and convincing evidence that the patent is invalid.[22] While no di-

19. The late Judge Alexander Holtzoff expressed his feelings in Isenstead v. Watson, 157 F.Supp. 7, 9 (D.D.C.1957) that the Patent Office approval provides an official imprimatur for drugs on which patents are sought.

20. Riverton also asserts that the tests on lower laboratory animals were inconclusive and inadequate.

21. Lorenz v. F. W. Woolworth Co., 305 F.2d 102, 105 (2d Cir. 1962). See Purer & Company v. Aktiebolaget Addo, 410 F.2d 871 (9th Cir. 1969) ; Rich Products Corporation v. Mitchell Foods, Inc., 357 F.2d 176 (2d Cir.), cert. denied, 385 U.S. 821, 87 S.Ct. 46, 17 L.Ed.2d 58 (1966); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772 (7th Cir.

1961) ; Panduit Corporation v. Stahlin Bros. Fibre Works, Inc., 298 F.Supp. 435 (W.D.Mich.1969); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corporation, 218 F.Supp. 1 (D.Md.1963), aff'd, 327 F.2d 497 (4th Cir.), cert. denied, 379 U.S. 826, 85 S.Ct. 53, 13 L.Ed. 2d 36 (1964).

22. Purer & Company v. Aktiebolaget Addo, supra n. 21; Eimco Corporation v. Peterson Filters and Engineering Co., 406 F.2d 431 (10th Cir. 1968); Copease Mfg. Co. v. American Photocopy Equipment Co., supra n. 21; Baker Manufacturing Co. v. Whitewater Manufacturing Co., 298 F.Supp. 1389 (E.D.Wisc.1969) ; Panduit Corp. v. Stahlin Bros. Fibre Works, Inc., supra n. 21.

rectly contrary statement has been expressed in this circuit, some clarification on the effect of the presumption has been made. In Rains v. Niaqua, Inc., the court noted that the presumption

> has no independent evidentiary value; rather, it serves to place the burden of proof on the person who asserts invalidity. Reasonable doubt on the issue of validity must be resolved in favor of the patent holder, but in the usual case a preponderance of the evidence determines the issue. 406 F.2d 275, 278 (2d Cir.) cert. denied, 395 U.S. 909, 89 S.Ct. 1751, 23 L.Ed. 2d 222 (1969).[23]

Whether this language imposes a burden of proof merely by a preponderance of the evidence is questionable, but *Rains* does serve to emphasize the evidentiary value of the presumption. However, in an abundance of caution, the court will not impose the burden of proof on the defendant to prove invalidity by clear and convincing evidence; the standard here established will require proof by the defendant by "a heavy burden of persuasion and * * * more than a dubious preponderance"[24] and will resolve reasonable doubt in favor of the patent holder. Rains v. Niaqua, Inc., supra.

It is clearly established that "a person sued for infringement may challenge the validity of the patent on various grounds, including fraudulent procurement." Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 176, 86 S.Ct. 347, 350, 15 L.Ed.2d 247 (1965). Riverton has alleged as a defense in this action, and as the basis for its counterclaim, that the patent in suit was obtained by the fraudulent actions of the patentees. Such an asserted scheme or plan to perpetrate a fraud on the Patent Office would be sufficient, if proven, to succeed as a defense here.[25] A valid patent is a grant of a monopoly to the patentee; however, proof of knowing and willful misrepresentation of facts to the Patent Office "would be sufficient to strip [the patentee] of its exemption from the antitrust laws." Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. at 177, 86 S.Ct. at 350. Proof of fraudulent procurement, as opposed to the mere allegation of devious conduct, could then result in a finding of patent invalidity and give rise to anti-trust violations by the patentee. See Green v. Aerosol Research Company, 286 F.Supp. 627 (N.D.Ill. 1968); 44 Texas L.Rev. 1024 (1966).

In its charge of fraudulent conduct on the part of the patentees, the defendant alleges that the patentees "represented to the Commissioner of Patents alleged beneficial effects [of the compound] based on insufficient and inconclusive tests on animals other than human beings."[26] Further, it claimed that the representations were false, made to the Patent Office with knowledge of falsity and with an intent to deceive the Patent Office so that the latter, relying on the false statements, would issue a patent. Put quite succintly, the defendant has failed to carry its burden of proof on these issues, and the record could not support a finding on any of these grounds. No showing of devious intent, even inferentially or circumstantially, was made out, no display of falsity of information shown and no evidence to bolster the claim of inconclusive and insufficient testing on the laboratory animals. This prong of the fraud defense must fail.

23. See Rich Products Corporation v. Mitchell Foods, Inc., supra n. 21; Lorenz v. F. W. Woolworth Co., supra n. 21.

24. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 7-8, 54 S.Ct. 752, 755, 78 L.Ed. 1453 (1934).

25. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250 (1944); Technograph Printed Circuits, Ltd. v. Bendix Aviation Corp., supra n. 21.

26. Amended Answer, para. 13.

Riverton also asserts that the patentees withheld from the Patent Office information "of the harmful effects on human beings of the patented material."[27] This allegation requires two separate areas of proof: Initially, that harmful effects on humans were disclosed through testing, and then that the patentees withheld such information from the Patent Office. Defendant has failed to sustain its burden of proof on either ground. Harmful effects, as opposed to certain discoverable side effects and counterindications, were not shown to have been learned and no withholding of test data on humans, as part of a scheme and plan to defraud, has been established.[28]

The most interesting cornerstone of the fraud defense, and the question which most clearly involves a matter of law, is the defendant's claim that the patentees

practiced a fraud on the Commissioner of Patents in that knowing that the patented material was intended for use on human beings, the patentees failed to conduct adequate, or any, tests on human beings to ascertain the harmful effects on human beings of the material claimed * * *.[29]

The thrust of this assertion is that the requirement of utility cannot be established in a chemical compound, one of whose intended uses—conceivably even its primary use—is as a drug for human consumption, unless the Patent Office is provided with tests on humans of such a character that it is convinced of the complete efficacy and safety of the item. Whether this is a statement of the law requires some background exploration.

Brenner v. Manson, 383 U.S. 519, 86 S. Ct. 1033, 16 L.Ed.2d 69 (1966), faced the issue of utility in a situation where the process on which a patent was sought yielded only a product whose utility as a practical matter, had not been established. The court, after determining that it possessed jurisdiction to review decisions of the Court of Customs and Patent Appeals on a writ of certiorari, noted that the word utility is "a simple, everyday word [filled] with ambiguity when applied to the facts of life." 383 U.S. at 529, 86 S.Ct. at 1039. In framing the issue before it, the Supreme Court recognized an apparent conflict between the Patent Office and the Court of Customs and Patent Appeals (CCPA) "over how the test is to be applied to a chemical process which yields an already known product whose utility—other than as a possible object of scientific inquiry—has not yet been evidenced." 383 U.S. at 529, 86 S.Ct. at 1039. In reversing the holding of the court below, the Supreme Court rejected the concept that a process may possess utility if it produces its intended product and is not detrimental to the public interest. The court held that the process would be patentable only if it produced a product which would be patentable, i. e. was "useful". It quite clearly stated that an end product must possess utility to be patentable and thus a chemical process must be useful to be patentable. If, as in Brenner, the process merely produced a substance "which either has no known use or is useful only in the sense that it may be an object of scientific research * * * ",[30] it does not possess the utility required. This discussion of Brenner does not directly provide an answer for the court in the case at bar. For no one asserts that at the time the patent issued, meprobamate was only a researcher's dream with no

27. Amended Answer, para. 13.

28. This aspect of the fraud defense fails even apart from any consideration of whether human data must be furnished to the Patent Office. Furthermore, at the time the continuation-in-part application was submitted, human testing had been completed only through phase one.

29. Amended Answer, para. 13.

30. Brenner v. Manson, 383 U.S. 519, 535, 86 S.Ct. 1033, 1042, 16 L.Ed.2d 69 (1966). See 80 Harv.L.Rev. 124, 166 (1966).

inherent utility in itself. It is obvious that meprobamate does not present the same extreme picture presented by the chemical process in *Brenner*.

The importance of *Brenner* in this case lies in the manner in which it left open a question of utility in a related area. In its opinion, the court stated that:

> In light of our disposition of the case, we express no view as to the patentability of a process whose sole demonstrated utility is to yield a product shown to inhibit the growth of tumors in laboratory animals. (Citations omitted) 383 U.S. at 531, n. 17, 86 S.Ct. at 1040.

The Supreme Court thus left as an open question the utility of the process it described when demonstrated in laboratory animals. The court cited certain cases decided by the CCPA in leaving the question open.[31] The implication could be drawn that there was an implied criticism of these CCPA cases and their holdings. But of significance here, the Supreme Court did not indicate its views on the questions of demonstrated safety and human testing to establish patent utility. It did bring into issue a process whose product was merely shown to have a tumor-inhibiting effect—a case somewhat similar to *Brenner*, but unlike meprobamate in this case. Thus, this court concludes from *Brenner* that a process or product, which merely yields something of use to researchers does not possess utility and that a process which produces a substance shown to have a tumor-inhibiting effect in laboratory animals may possess this deficiency. *Brenner*, in this court's opinion, did not disturb the holdings of the CCPA insofar as scope and character of testing and safety for humans is concerned, except for any matters stated in those cases which conflict with the *Brenner* holding. As the Supreme Court noted, "a patent is not a hunting license. It

is not a reward for the search, but compensation for its successful conclusion." 383 U.S. at 536, 86 S.Ct. at 1042. In the case at bar, meprobamate was more than a research tool, it had a demonstrated value in and of itself.

The cases decided by the Court of Customs and Patent Appeals in the area of required testing[32] hold, in substance, that:

> When an applicant for a patent has alleged in his patent application that a new and unobvious chemical compound exhibits some useful pharmaceutical property and when this property has been established by statistically significant tests with 'standard experimental animals,' sufficient statutory utility for the compounds has been presented. Application of Krimmel, 292 F.2d 948, 953, 48 C.C.P.A. 1116 (1961).

The rationale behind this stated rule is that a useful contribution to the art has been made even though the substance may prove to be without value in human treatment. Without detailing the factual questions presented in the CCPA cases in issue, it is fair to state that they do not require human tests to establish utility even where it is disclosed that the substance is "useful in the treatment of a condition which can occur both in man and in lower animals, and it is agreed that the disclosure does not exclude the treatment of man." Application of Krimmel, 292 F.2d at 952. This rule, considered in the context of the case at bar, appears to be a sound one. No authority can be found for the proposition that human tests are required to establish utility for a compound such as meprobamate.

In Application of Hartop, 311 F.2d 249, 251, 50 C.C.P.A. 780 (1962), the court was confronted with the proposition that "if [the patentee's] solu-

---

31. Application of Hitchings, 342 F.2d 80, 52 C.C.P.A. 1141 (1965) ; Application of Bergel, 292 F.2d 955, 48 C.C.P.A. 1102 (1961) ; Application of Krimmel, 292 F.2d 948, 48 C.C.P.A. 1116 (1961) ;

Application of Dodson, 292 F.2d 943, 48 C.C.P.A. 1125 (1961).

32. See footnote 31, supra.

tions are not 'safe' for the alleged use, they lack the utility required by 35 U.S.C. § 101." The problem of side effects of a substance, whether to be found in lower animals or humans, was noted, but the court reasoned that such a substance would be "*more* useful if they were not dangerous or did not have undesirable side effects, but the fact remains that they *are* useful, useful to doctors, veterinarians and research workers, useful to patients, both human and lower animal, and so are useful within the meaning of 35 U.S.C. § 101." Application of Hartop, 311 F.2d at 255.[33] This holding has not been seriously questioned for it is the opinion of this court that the Patent Office should take safety into consideration only to determine if the substance is so dangerous that any utility is fully negated. It does not appear that the function of the Food and Drug Administration in the area of new drug licensing for human use should be usurped or duplicated by the Patent Office. Until Congress alters the reasonably clear demarcation between Patent Office and FDA functions in the licensing of drugs, it would be foolhardy at best to engraft such a requirement into the patent statutes. Application of Hartop, supra; Application of Krimmel, supra.

■ One vitally significant feature of this case involves the recognition of the expertise of the Patent Office in the grant or rejection of patent applications. In the case at bar, after receipt of information from the patentees, the patent examiner requested selected information on test comparisons. This data was furnished to him and there is no showing that it was anything but complete and truthful. After consideration of all material furnished, the patent examiner found utility present and the Patent Office issued the patent. The Supreme Court has recognized the special expertise of the Patent Office, and though not conclusive, a factor to be considered. Bren-

ner v. Manson, 383 U.S. at 531–532, 86 S.Ct. 1033. In the *Brenner* case, the patent examiner had found that the patentees had failed to make a showing that utility was present. It was this finding that was overturned by the CCPA. The court in *Brenner* noted that "in this technical area, we would not overturn the finding of the Primary Examiner, * *." 383 U.S. at 531–532, 86 S.Ct. at 1040. In the case at bar, the defendant urges the holding of *Brenner* on the court as controlling, while overlooking the expertise of the Patent Office recognized therein. In the circumstances of this case, the Court gives weight to the findings of the Patent Office and the expertise there involved. While not accepting their conclusions out of hand since questions of law are involved,[34] there is considerable significance in their knowing and unquestioned grant of this patent. See Merck & Co. v. Chase Chemical Company, 273 F.Supp. 68, 79 (D.N.J.1967).

■ As noted previously, there is no question that the law requires applicants for a patent to disclose all relevant matters to the Patent Office in a truthful manner. As the Supreme Court described this obligation in *Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co.*:

> Those who have applications pending with the Patent Office or who are parties to Patent Office proceedings have an uncompromising duty to report to it all facts concerning possible fraud or inequitableness underlying the applications in issue. * * * Public interest demands that all facts relevant to such matters be submitted formally or informally to the Patent Office, which can then pass upon the sufficiency of the evidence. Only in this way can that agency act to safeguard the public in the first instance against fraudulent patent monopolies. (Citation omitted) 324 U.S. at 818, 65 S.Ct. at 999.

33. The concept of utility for researchers alone has been rejected by Brenner v. Manson, 383 U.S. 519, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966).

34. See Lear, Inc. v. Adkins, 395 U.S. 653, 670, 89 S.Ct. 1902, 23 L.Ed.2d 610 (1969).

Standing as they do in a confidential relationship before the Patent Office,[35] the patentees must frankly and truthfully disclose all relevant facts to it.[36] The court has discussed the question of omissions and misrepresentations by the patentees in this case and has found that the defendant has failed in its burden of establishing that either of these deficiencies were present. Thus, the court need not even reach the question of whether the patent would have issued if fraudulent conduct were established.[37] The court holds that the defendant has failed to prove that the patentees violated their duty of full and frank disclosure to the Patent Office.

■■■■■■ The relevant statute, 35 U.S. C. § 112 (1964 ed.), requires that there "shall set forth the best mode contemplated by the inventor of carrying out his invention." This requirement has been expressed in a number of ways, but it has been consistently held that the statute requires the disclosure to "be one which will 'enable any person skilled in the art to which it pertains, or with which it is most nearly connected', to make and use the invention." Application of Hitchings, 342 F.2d 80, 87, 52 C.C.P.A. 1141 (C.C.P.A.1965). Furthermore, the inventor is not required to correctly designate the objectively best method of use, for even if there be a better method than that which he states, "[i]t is enough that he act in good faith in his patent disclosure." Benger Laboratories, Limited v. R. K. Laros Company, 209 F.Supp. 639, 644 (E.D.Pa. 1962), aff'd, 317 F.2d 455 (3d Cir.), cert.

denied, 375 U.S. 833, 84 S.Ct. 69, 11 L.Ed.2d 64 (1963). It is clear to the court that when Dr. Berger designated his "best mode" in the patent, he was acting in good faith and that even though he might have more elaborately or differently stated it, he complied with the statute. His statement of "best mode" was sufficient to permit one skilled in the art to make use of his invention.[38]

The court holds that the defendant has failed to meet its burden of proving that the patent in suit issued due to a fraud practiced upon the Patent Office. Considering the expertise of the patent examiner as a factor and in light of the applicable law, the court holds that the patent sufficiently meets the requirement of "utility" set forth in 35 U.S.C. § 101 and that the defendant has failed to overcome the *prima facie* validity of the patent. The court holds the patent to be valid and entitled to its anti-trust exemptions.[39]

■■■■■ The issue of alleged interference with the defendant's government contracts requires little discussion. The court has already found a failure to connect any improper activities of the plaintiff with their inability to fulfill their contracts. Thus, even considering the applicable statute (28 U.S.C. § 1498 (1964 ed.)), the court finds a failure of proof in this regard and this defense against enforceability of the patent has not been established.

■■■■■ The only remaining defenses to enforceability of the patent have been effectively removed from the case. The defendant expressly abandoned its defense

---

35. Charles Pfizer & Co. v. Federal Trade Commission, supra n. 11, 401 F.2d at 579.

36. See Monolith Portland Midwest Company v. Kaiser Aluminum & Chemical Corporation, 407 F.2d 288 (9th Cir. 1969); 44 Texas L.Rev. 1024 (1966); 34 Geo.Wash.L.Rev. 540 (1965).

37. Charles Pfizer & Co. v. Federal Trade Commission, supra n. 11, 401 F.2d at 582.

38. All other requirements having been met, the court finds the breadth of claims to be proper, the inventor being entitled to all uses of his invention. Radio Corporation of America v. Radio Engineering Laboratories, Inc., 293 U.S. 1, 14, 54 S.Ct. 752, 78 L.Ed. 1453 (1934).

39. See Walker Process Equipment, Inc. v. Food Machinery & Chemical Corp., 382 U.S. 172, 86 S.Ct. 347, 15 L.Ed.2d 247 (1965); Crown Machine & Tool Co. v. KVP-Sutherland Paper Co., 297 F.Supp. 542 (N.D.Cal.1968).

that the plaintiff extended its patent monopoly to unpatented materials and the court holds that the concession of failure of proof is proper.[40] While such a defense is sufficient if proven,[41] it is clear that the defendant has suffered a failure of proof in this regard. In addition, there has been no proof of any kind of illegal tying arrangement with reference to unpatented materials. Zenith Radio Corporation v. Hazeltine Research, Inc., supra. The defendant has also conceded that it did not prove its defenses of misuse of the patent privilege and unclean hands on the part of the plaintiff.[42] Once again these are viable defenses if proven,[43] but the court finds a failure to so establish that either aspect is present in this case.

Plaintiff asserts that the conduct of the defendant was so willful and deliberate that punitive damages and attorneys' fees should be awarded as part of the judgment. The court recognizes that, in its discretion, punitive damages may be awarded,[44] but, after evaluating the defendant's actions, declines to award such a grant. Further, the court finds that the plaintiff has failed to establish its entitlement to attorneys' fees. The applicable statute, 35 U.S.C. § 285 (1964 ed.), is controlling and "[u]nder that provision the award of attorneys' fees is discretionary with the court, and should not be allowed except upon a finding of unfairness, bad faith, or inequitable or unconscionable conduct." Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc., 299 F.Supp. 278, 285 (S.D.N.Y. 1969). See Monolith Portland Midwest Company v. Kaiser Aluminum & Chemical Corporation, 407 F.2d 288 (9th Cir. 1969). The plaintiff has not proven the bad faith of the defendant in the fact and manner of its litigation of this action. Thus, this is not a case "which makes it grossly unjust that the prevailing party be left to bear the burden of his own counsel fees." Purer & Company v. Aktiebolaget Addo, 410 F.2d at 880. The request for punitive damages and attorneys' fees is denied in the exercise of the court's discretion.

The court holds that the patent in suit is valid and infringed and thus the plaintiff is entitled to a judgment including damages, injunctive relief and an accounting. The counterclaim and the defenses of the defendant are dismissed.

The above shall constitute the court's findings of fact and conclusions of law in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

Settle an order.

---

40. See footnote 6, supra.

41. Mercoid Corp. v. Mid-Continent Investment Co., 320 U.S. 661, 64 S.Ct. 268, 88 L.Ed. 376 (1944); Glen Manufacturing, Inc. v. Perfect Fit Industries, Inc., 299 F.Supp. 278 (S.D.N.Y.1969).

42. See footnote 5, supra.

43. See Precision Instrument Manufacturing Co. v. Automotive Maintenance Machinery Co., 324 U.S. 806, 65 S.Ct. 993, 89 L.Ed. 1381 (1945); Keystone Driller Co. v. General Excavator Co., 290 U.S. 240, 54 S.Ct. 146, 78 L.Ed. 293 (1933); Gillman v. Stern, 114 F.2d 28 (2d Cir.) cert. denied, 311 U.S. 718, 61 S.Ct. 441, 85 L.Ed. 468 (1940); Buono v. Yankee Maid Dress Corporation, 77 F.2d 274 (2d Cir. 1935); Stiftung v. V.E.B. Carl Zeiss, Jena, 298 F.Supp. 1309 (S.D. N.Y.1969); Valmont Industries, Inc. v. Yuma Manufacturing Company, 296 F. Supp. 1291 (D.Colo.1969).

44. Coleman Company v. Holly Mfg. Co., 269 F.2d 660 (9th Cir. 1959).