CARTER–WALLACE, INC., Plaintiff,

v.

WOLINS PHARMACAL CORP., Defendant.

No. 70 C 45.

United States District Court, E. D. New York.

Feb. 5, 1971.

William D. Denson, New York City (George P. Hoare, Jr., Morgan, Finnegan, Durham & Pine and Breed, Abbott & Morgan, New York City, of counsel), for plaintiff.

Myron Cohen, New York City (Hubbel, Cohen & Stiefel, New York City, of counsel), for defendant.

## MEMORANDUM and ORDER

DOOLING, District Judge.

Plaintiff moves in a patent suit for a preliminary injunction. The determinative facts are undisputed.

The patent involved is United States Patent No. 2,724,720, issued November 22, 1955, on an application filed August 3, 1953. Claim 4 of the patent is upon a therapeutic agent called meprobamate, a drug used in the treatment of disorders of the central nervous system, and among other purposes, as a tranquilizer. It is known popularly by such trade names as Miltown and Equanil. In Carter-Wallace, Inc. v. Riverton Laboratories, Inc., S.D.N.Y., 65 C 4, the Honorable John W. Cannella, held the patent valid and infringed (304 F.Supp. 357), and the Court of Appeals unanimously affirmed Judge Cannella's decision, November 9, 1970, 433 F.2d 1034. There is pending and undetermined in the District Court of New Jersey an infringement suit by Carter-Wallace, Inc. v. Zenith Laboratories, Inc. That case, initiated in 1968, appears to be far from final determination. A second case in this court, Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 70 C 369, is at a standstill because defendant has filed a Chapter 11 Petition and is seeking authority to retain patent counsel to defend the suit. Defendant in the present action has received most of its supply of meprobamate from Zenith but was once a customer of Riverton.

Plaintiff has undeniably owned the meprobamate patent from the date of its issue. The product is manufactured for plaintiff by licensed manufacturers who do not distribute the product or market it in any way but are simply contractors

to manufacture for delivery to plaintiff. Plaintiff in turn sells meprobamate through two channels of distribution. It sells it in bulk as a powder to qualified pharmaceutical manufacturers (such as Merck, Lederle, Wyeth, etc.), who make up tablets which they sell, usually under their own trademarks. Plaintiff also makes up tablet meprobamate which it sells under its own trade name of Miltown through the regular drug wholesalers (who supply retail druggists), and to institutional buyers, hospitals, etc.

Since 1962 over one hundred qualified pharmaceutical houses have bought meprobamate in powder form from plaintiff and twenty-three qualified pharmaceutical houses in the United States are now buying meprobamate from plaintiff. During plaintiff's fiscal year ended March 31, 1970, twenty-three such companies bought over $13,000,000 worth of meprobamate powder. Plaintiff in the first ten years of use sold about 14 billion tablets, and it is said that about 500,000,000 prescriptions for meprobamate have been written in the United States for an estimated 100,000,000 patients. Carter has spent about $25,-000,000 in marketing the product, and it spent over $2,000,000 in research and development of the product. The patent will expire on November 22, 1972, in less than two years.

Counsel recognize that a preliminary injunction of infringement so closely approaches the granting in full of one branch of the relief to which plaintiff can be entitled only if it prevails after the trial of the action on the merits that extraordinary circumstances are required to justify the preliminary relief. Plaintiff marshals to the support of its motion that it has in this case an extraordinarily high probability of ultimate success, *first*, because of the successful litigation with *Riverton* and, *second*, the extraordinary strength of the inference to be drawn in this case from the widespread recognition of the patent and acquiescence in its monopoly in the face of circumstances furnishing high motiva-tions for challenging the validity of the patent. It argues further that irreparable damage from further infringement is clearly present, and that the "antitrust" defenses are not supported here, were rejected in *Riverton,* and are faring badly in its Court of Claims case against the Government.

Against a background of fact not at present made clear in this case it appears that the defendant and American Home Products Corporation were in 1960 sued by the United States for attempting or achieving a monopoly in the product of the patent or its exploitation. The litigation ended in a consent decree entered November 9, 1962, in the Southern District. See United States v. Carter-Products, Inc., D.C., 1962, 211 F. Supp. 144. The elaborate consent decree (*inter alia*) unequivocally requires plaintiff to sell meprobamate to any qualified pharmaceutical company at not more than twenty dollars a pound, adjusted to any change in the B.L.S. index from the base-date of June 1962 (the present adjusted maximum price is $24.75 a pound). The decree requires plaintiff to make every reasonable effort to assure a supply of meprobamate adequate to discharge its decretal obligation to sell meprobamate to all qualified pharmaceutical manufacturers, licensing others to manufacture meprobamate solely for sale to Carter if Carter and its other licensees are unable to supply the demand.

Under the decree the broad market for meprobamate has grown up. While the price term of the decree is a maximum price, and not a fixed price, plaintiff makes all sales of powder at the maximum price. With the passage of time the price has become one that is high above cost plus an ordinary manufacturing profit. The product can be made and marketed at a cost such that a price of seven to eleven dollars for one thousand tablets is compensatory, at least if the product is marketed in the manner usual to mail order houses marketing pharmaceuticals by their generic names. That implies that the cost of a

sales solicitation structure and of advertising support is not reflected in the seven to eleven dollar sales price, but it is apparently agreed that the price disparity, figured on any basis, is large.

Much if not all of the meprobamate becoming available in this country at the present time for "infringers" is made abroad. Apparently foreign patent coverage has not been complete and for some considerable period of time substantial manufacture of meprobamate has taken place in Western Europe.

Notwithstanding the extraordinary success of the product and the early effort to restrict its distribution, it appears that there was no known and significant infringement until Riverton commenced to infringe in the fall of 1964. Plaintiff asserts that it sued Riverton promptly and pressed the case on to as prompt and successful a conclusion as it could manage. Similarly when and as it has learned of other infringements, such as that of Zenith, plaintiff has acted promptly to support its patent.

Plaintiff avers that for nine years the industry paid total respect to the patent. Two further incidents are advanced by plaintiff as specific and striking examples of the recognition accorded to the patent. It asserts that McKesson & Robbins, which in the calendar year 1969 had bought over $1,500,000 worth of meprobamate powder from plaintiff, found that it could not market its meprobamate in competition with the mail order houses marketing meprobamate under its generic name at very low prices. Accordingly beginning in 1969 McKesson & Robbins retired from the market. In 1970 its purchases from plaintiff were only 7% of what it had bought in the previous year. Plaintiff argues that this financially competent and presumably well-advised company withdrew from the business rather than challenge the patent in order to preserve a business in the product. The second incident allegedly illustrative of the strength of plaintiff's patent position involved Barry-Martin, a pharmaceutical

house, which distributed meprobamate tablets to dealers in Miami, Florida, and thereabouts. Plaintiff sued Barry-Martin for infringement, and, after conferences with its counsel, a consent judgment enjoining further infringement was entered.

Defendant points out, and plaintiff agrees, that neither the District Court nor the Court of Appeals directly reviewed and decided on evidence that the patent involved patentable novelty of subject matter in the perspective of 35 U.S.C. §§ 102 and 103. But plaintiff asserts that Riverton fully presented the invalidity defense in its answer (although citing only the prior art which is also cited at the foot of the patent), that the issue was explored as the case was developed for trial on both sides, and that the issue of invalidity for want of patentable novelty was then abandoned at final pre-trial in favor of other issues only because no significant prior art had been turned up.

The patent and the product are so well known that, it must be inferred, it would be possible without great effort to indicate at the present time the line that an attack on patentable novelty might take. There is no indication in the defendant's papers that significant prior art has been located or any promising lead turned up. Of course, such things cannot be done over night. But the fame of the patent should, it may be supposed, have given rise to an extensive literature which would have related the product of the patent and its mode of operation to what was earlier known; the text of the patent indicates that the products of the patent grew out of a background of experience with "related compounds" possessing anti-convulsant properties, and that the new products furnished protective action of longer duration than certain organics "from which they are derived." (See Column 1 of the patent, at lines 44 through 54.) And, as plaintiff points out, the concession of patentable novelty is indeed an extraordinary one and one which it appears was not accepted in the Court of

Appeals for the Second Circuit except upon the Court's satisfying itself that the patent office had been "careful and deliberate in reaching its decision of patentability in this case." (433 F.2d at 1040). The Court was speaking very largely in terms of satisfying the generalized standard of 35 U.S.C. § 101, and largely from the viewpoint of utility, but the Court evidently intended its statement to have a somewhat broader coverage. The issue of patentable novelty has not been adjudicated. But the Court's language indicates that neither the District Court nor the Court of Appeals suspected the good faith or good sense of the concession of patentable novelty.

Defendant is not bound by the outcome of the *Riverton* case. It can litigate validity, and the *Riverton* decision is no more than a precedent on the same points if raised again in the present case. Nevertheless it does indicate that in all the circumstances there is at this time every circumstantial indication that *plaintiff's case is attended with a very* high probability of success.

Defendant has been in business for some twenty-two years. Last year its sales amounted to about seven and a half million dollars, and it functions in what is generally recognized as a distinct ethical channel of drug distribution. It is a mail order house and, in general, specializes in the sale of pharmaceuticals by their generic names. It has been selling meprobamate tablets at prices ranging between seven and eleven dollars a thousand and it is in competition with other mail order houses which also sell meprobamate tablets as cheaply as seven to eight dollars per thousand. These competitors, are, defendant says, Darby Drug Company, Sherry Drug Company, Paramount Drug Company, (a subsidiary of Zenith Laboratories, Inc.) Modern Discount Drug Company, Interstate Drug Company, Blank Drug Company, Schein Surgical Supplies, and Spencer Mead Company. Defendant contends that if it is enjoined from infringement and can obtain meprobamate only from plaintiff it will have to drop the product from its line, since it cannot sell the product some thirty dollars a thousand or something a little less than that in competition with other mail order houses which will continue to offer the identical product at seven or eight dollars. Defendant says that it will not only lose the business on the meprobamate, but it will also lose a great deal of other business because, it asserts, its present customers will be loathe to break down their orders between two mail order houses, and they will inevitably place their orders with the mail order houses that will sell low-priced meprobamate along with the other pharmaceuticals. The contention embraces an element of speculation but it is not implausible nor unpersuasive.

Plaintiff on the other side argues that defendant's conduct manifestly inflicts irreparable damage on it. Instancing the experience with McKesson & Robbins, plaintiff argues that the sales of defendant and similar infringers not only divert business from plaintiff and its customers but absolutely effect a contraction of the market because when customers like McKesson & Robbins stop selling meprobamate they promote sales of substitutes for meprobamate. In addition, plaintiff argues, the defendant is establishing a foothold for competition in the sales of meprobamate at a price level reflecting the expiration or non-existence of the patent. Plaintiff contends that the consent decree assures the defendant all of the meprobamate it needs —at plaintiff's price—to serve its business on lawful terms, and that it must therefore elect to buy at plaintiff's price if enjoined from infringement and yet determined to continue in business.

Defendant answers by pointing to the antitrust defenses put forward here, in the *Zenith* case, and in the *Riverton* case, and which have also been presented in the action against the United States in the Court of Claims; in *Riverton* defendant abandoned the aspect of the antitrust defense there litigated when its proofs failed (304 F.Supp. at 360 and

fn. 6, 373–374); and in the Court of Claims case a Commissioner struck (subject to review by the Court of Claims) the specific antitrust defenses there interposed. The antitrust answers are not in the same form in the several cases. However, bare compliance on the part of Carter-Wallace, Inc. with so much of the consent decree as requires it to sell to all qualified pharmaceutical houses at a price not in excess of twenty dollars a pound (adjusted by the B.L.S. change) would not exclude the possibility of antitrust violations in the context of the decree. If, as has been suggested, plaintiff has rigidly adhered to the maximum price as its minimum price as a matter of its own unilateral judgment uninfluenced by agreement with others, it may well be concluded that plaintiff has done no more than continuously to demonstrate the value of its invention. Few courses of conduct are better calculated to stimulate the search for an equal or better drug. If adherence to that price was not the unilateral determination of plaintiff in its own interest, but was the product of an agreement with others in the industry who themselves had an interest in a high price level, the situation could conceivably be otherwise. Strict compliance with the specific commands and prohibitions of the decree does not effect a total immunity from antitrust liability with respect to acts which can be performed at the same time that the explicit terms of the decree are complied with. But, again, defendant is able to point to nothing on which it can now fairly build an expectation of success on the antitrust issues to counterbalance plaintiff's showing that they have thus far failed.

Defendant argues that it is the victim of selective enforcement of the patent, that it is inequitable to enjoin it from dealing in the product of the patent unless other infringers are as vigorously pursued and equally enjoined; and it notes that no preliminary injunction was sought in the Zenith case. Plaintiff answers that a motion is being presented in the New Jersey case but it cannot be heard for another two weeks; plaintiff observes that it has the advantage of the Riverton decision only in this Circuit and that its chances of obtaining a preliminary injunction are at their highest in this Circuit. Possibly plaintiff hopes that a preliminary injunction here can increase its confidence in other Courts.

Defendant's point has strength. Ideally, the motion could be denied or granted out of hand if it were possible to start the trial of the action on the merits at once in the confidence that it could be decided so promptly that the time lapse was dwarfed beside the remaining patent life. But while plaintiff, seasoned in the Riverton and Zenith cases, is willing to commence a trial forthwith, defendant's patent counsel reasonably points out that he is new to the case, that he can not hope, even by pressing the prior-art searches hard, to be ready for trial of the patent issues for six months, and that, even then, the antitrust issues will remain. While the case has been pending for just over a year, defendant's earlier patent counsel, furnished by Zenith in pursuance of an obligation as indemnitor, recently felt constrained to withdraw because of problems arising out of a major difficulty between Zenith and defendant about the indemnity and a consequential untested apprehension on counsel's part that a conflict of interest confronted them if they continued to act as patent counsel for both firms. If substantial delay in reaching the merits is inevitable, it would appear that any injunction granted in the present case should be recognized by plaintiff as imposing on it a duty of reasonably pursuing others who are infringing.

The relief sought is extraordinary, but the conditions that warrant the relief, upon the principle expressed in the cases, are present here. See Norwich Pharmacal Co. v. Veterinary Corp., M. D.Ga.1968, 296 F.Supp. 937, 942; H. J. Ashe Co. v. Bridgeport Metal Goods Mfg. Co., S.D.N.Y.1967, 273 F.Supp. 196, 198–200: The injunction must be conditioned on the plaintiff's giving of

adequate security against defendant's damages in case defendant prevails on the merits, and its undertaking, if defendant elects to buy meprobamate from plaintiff or any other non-infringing United States source and prevails in the litigation, then to pay to defendant the difference between the price paid by defendant for meprobamate hereafter acquired from regular non-infringing United States sources of supply and the price at which defendant would have been able to buy equal quantities from the suppliers to the infringing mail order houses. If defendant is so secured, it can be expected to make the choice of alternative courses of conduct open to it in terms of its own estimate of the validity of the patent.

It is accordingly

Ordered that the defendant, its officers, agents, servants, employees and attorney and those persons in active concert or participation with it who receive actual notice of this Order of Injunction by personal service or otherwise, cease and desist from infringing Claim 4 of United States Patent No. 2,724,720 by making or using or vending meprobamate other than that procured from plaintiff or other non-infringing United States sources of supply provided that

*First*, plaintiff gives security in the amount of $75,000 for the payment of such costs and damages (including damages due to defendant's giving up sales of meprobamate during the period the injunction continues in effect) as may be incurred or suffered by defendant if it is found that it has been wrongfully enjoined or restrained because the patent is invalid or not infringed or is otherwise unenforceable against defendant; and

*Second*, provided that plaintiff in addition delivers to defendant its unconditional undertaking to pay to defendant, if defendant elects to buy meprobamate from plaintiff or any other non-infringing United States source of supply and prevails in this action by reason of invalidity or non-infringement of the patent or for other reason, an amount equal to

(a) the difference between the unit price to qualified pharmaceutical houses of meprobamate in the non-infringing United States market and the unit price of such meprobamate in the infringers' market on sales to mail order houses regularly marketing pharmaceuticals by their generic names in ethical drug channels, multiplied by (b) the number of units of meprobamate defendant buys after the date of this order and during the period of its continuance in force (but not later than November 22, 1972) from plaintiff or other non-infringing United States suppliers to qualified pharmaceutical houses.