**CARTER–WALLACE, INC., Plaintiff-Appellant,**

v.

**William N. OTTE, as Trustee in Bankruptcy of Davis-Edwards Pharmacal Corp., Defendant-Appellee.**

**No. 297, Docket 72–1406.**

United States Court of Appeals, Second Circuit.

Argued Sept. 14, 1972.

Decided Nov. 14, 1972.

Certiorari Denied June 4, 1973.

See 93 S.Ct. 2753.

Edward J. Ross, New York City (Breed, Abbott & Morgan, New York City, of counsel), George B. Finnegan, Jr., New York City (Jerome G. Lee, John D. Foley, George P. Hoare, Jr., Stephen R. Smith, and Morgan, Finnegan, Durham & Pine, New York City, of counsel), for plaintiff-appellant.

Charles R. Brainard, New York City (Richard K. Parsell, Paul H. Heller, Stuart J. Sinder, George E. Badenoch, Kenyon & Kenyon, Reilly, Carr & Chapin, and Robert P. Herzog, New York City, of counsel), for defendant-appellee.

American Patent Law Assn, Arlington, Va. (Donald R. Dunner, Washington, D. C., Ellsworth H. Mosher, Arlington, Va., and John W. Brumbaugh, New York City, of counsel), filed a brief as amicus curiae.

Before FRIENDLY, Chief Judge, and LUMBARD and FEINBERG, Circuit Judges.

FRIENDLY, Chief Judge:

In Carter-Wallace, Inc. v. Davis-Edwards Pharmacal Corp., 443 F.2d 867 (2 Cir. 1971), we reversed a preliminary injunction issued by Judge Dooling in the District Court for the Eastern District of New York, restraining Davis-Edwards Pharmacal Corp. (Davis-Edwards), then a debtor in arrangement proceedings under Ch. XI of the Bankruptcy Act, from its conceded infringement of Claim 4 of United States Patent 2,724,720, owned by Carter-Wallace. Claim 4 was on a new composition of matter, meprobamate, which became a highly successful drug widely known by its trade-names, Miltown and Equanil. Our reversal was based on the settled rule that, in the absence of prior adjudication of validity or long acquiescence, "an injunction pendente lite in a patent suit should not go except when the patent is beyond question valid and infringed." Simson Bros., Inc. v. Blancard & Co., 22 F.2d 498, 499 (2 Cir. 1927). The majority's discussion of the patent went only so far as to hold that it was not "beyond question valid;"[1] we emphasized, 443 F.2d at 880, 884, that we were in no way intimating our view of the proper resolution of the issue of patent validity. Familiarity with our earlier opinion is here assumed.

On remand, a trial on the merits of the patent issues was conducted before Judge Dooling.[2] In a carefully considered and necessarily lengthy opinion, 341 F.Supp. 1303, 173 U.S.P.Q. 65 (E.D.N.Y. 1972), Judge Dooling found the patent claim for meprobamate invalid, dismissed the complaint, and directed that final judgment be entered on the claim of patent infringement, F.R.Civ.P. 54(b). From this ruling Carter-Wallace has appealed.

### I. *Mootness*

■ Before we reach the issue of the validity of the meprobamate patent, we must consider two preliminary issues raised by Carter-Wallace. The first is its motion to dismiss its own appeal as moot. Understandably, Carter-Wallace does not wish simply a dismissal of the appeal but seeks also an order vacating the judgment of the district court. We will assume that under United States v. Munsingwear, Inc., 340 U.S. 36, 39–40, 71 S.Ct. 104, 95 L.Ed. 36 (1950), it would be entitled to such an order if the case has in fact become moot.

Carter-Wallace's motion is grounded upon a series of events occurring since the trial. During the past winter, storm damage and water seepage at Davis-Edwards' Connecticut plant apparently contaminated its entire stock of pharmaceuticals. In January 1972, state health authorities, acting in conjunction with the Food and Drug Administration, seized and condemned these drugs, including all of Davis-Edwards' meprobamate, as having become unfit for pharmaceutical manufacture. As a result, Davis-Edwards ceased operations and, on April 12, 1972, was adjudicated a bankrupt. All of its tangible assets have now been sold. The trustee in bankruptcy is thus left with a bank account with a balance of approximately $61,000, subject to liens which he expects to settle for no more than $21,000, and a savings account of some $5600. Priority claims against the bankrupt estate vastly exceed these assets. Davis-Edwards' only other assets are an insurance claim, of unspecified amount and apparently subject to a se-

---

1. Judge Mansfield, dissenting, thought that "Carter ha[d] satisfied the burden imposed by the *Simson Bros.* rule." 443 F.2d at 886.

2. The judge had previously severed defendant's counterclaims for anti-trust violations, discussed by Judge Mansfield at 443 F.2d at 894. See 341 F.Supp. at 1340.

curity interest, arising out of the storm damage to its plant and consequent contamination of its physical inventory; and its counterclaims against Carter-Wallace for antitrust violations,[3] which Carter-Wallace deems valueless in light of Judge Mansfield's observations when the case was last here, 443 F.2d at 894,[4] and the disposition of similar defenses raised by the United States in the action against it by Carter-Wallace in the Court of Claims, Carter-Wallace, Inc. v. United States, 449 F.2d 1374, 196 Ct.Cl. 35 (1971) (Davis, J.).

Shortly after it was apprised of these facts, Carter-Wallace moved on June 15, 1972, to dismiss its appeal and vacate the judgment below, contending that since it would be impossible for Davis-Edwards to resume infringement before the patent expires on November 22, 1972, and since Carter-Wallace cannot recover monetary damages, the case has become moot. This motion was heard before a panel of this court on June 27, 1972, and referred to the panel hearing the merits of the appeal.

■ Carter-Wallace's argument overlooks two critical points. First, its claim for damages for infringement subsequent to the filing of the Chapter XI petition ranks as an administration expense entitled to a first priority under § 64a of the Bankruptcy Act. See 443 F.2d at 874. Although there appears to be one claim of about $47,000 of higher priority, if Carter-Wallace should prevail on this appeal it seems likely that it could recover some small amount as its share among the first priority claims. Second, and more important, it became clear at oral argument that the trustee's savings account of $5600 represents the balance of the fund which we had directed, 443 F.2d at 884, be established by Davis-Edwards in the amount of 5% of the gross proceeds of its sales of meprobamate from the date of the preliminary injunction, February 25, 1971, to be held in escrow for Carter-Wallace's benefit should it prevail on the merits.[5] To be sure, this is exceedingly small meal when compared to the possible effect of a contrary decision as collateral estoppel, under Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971), in Carter-Wallace's suit against the United States, and the problems a contrary decision may create in the defense of an action brought in the District of New Jersey by Zenith Laboratories on behalf of itself and other purchasers of meprobamate, in which plaintiffs will doubtless also seek to avail themselves of collateral estoppel. Indeed, any possible recovery is much smaller than the expense of prosecuting this appeal. But we cannot see how we can hold this appeal to be moot when reversal would enable the appellant to collect something, however small. Moreover, if this were relevant, we do not regard the equities as being so impressively in Carter-Wallace's favor as it con-

---

3. Appellee also includes among its assets its right to recover payments from Carter-Wallace, if the patent is held to be invalid, for meprobamate purchased before it began to infringe. Apart from doubt as to the validity of this theory of recovery, see Troxel Mfg. Co. v. Schwinn Bicycle Co., 465 F.2d 1253 (6 Cir. 1972), this potential asset adds nothing to the assets available to Carter-Wallace should it ultimately recover on its patent infringement claim; Carter-Wallace's argument that it cannot benefit from a reversal is not answered by arguing that it may lose from an affirmance.

4. Because the majority reversed the grant of the preliminary injunction on the ground that the patent was not "beyond question valid," it had no occasion to consider the antitrust phase of the case.

5. Apparently the fund had once amounted to nearly $10,000 but, after the district court's decision, the referee in bankruptcy allowed the trustee to invade the escrow account, allegedly on the basis of a misrepresentation that we had affirmed the holding of invalidity. In view of our conclusion on the merits, we need not pursue this question beyond noting that the referee should not have allowed such invasion without at least giving Carter-Wallace notice and opportunity to be heard.

tends. Carter-Wallace has long been aware of Davis-Edwards' weak financial condition; indeed, when the case was last here, it was Carter-Wallace that argued that the defendant's insolvency justified the preliminary injunction it had been awarded. See 443 F.2d at 874. Yet it was Carter-Wallace that chose to pursue this impecunious infringer in the last years of the patent, to push ahead with the trial on the merits against an insolvent defendant, and to take up many days of judicial time with a prosecution which, even on the facts then known, could not of itself have warranted the large expense.

## II. *Fairness of Trial*

Carter-Wallace also contends that the procedure allowed by Judge Dooling at the trial was such gross error, and so prejudiced the plaintiff, as to warrant summary reversal without consideration of the merits. To put this contention in its proper perspective, the circumstances which led to the procedure must be understood.

At the hearing with respect to the grant of a preliminary injunction, and on the appeal therefrom, Davis-Edwards, despite its precarious financial condition, was represented by experienced patent counsel, as its trustee again is on this appeal. However, although these lawyers did agree to handle the antitrust issues, contemplating that most of these would be presented by a motion for summary judgment, Davis-Edwards was unable to retain them to undertake the trial on the merits of the patent issues. Thus, William H. Bisnoff, house counsel for Davis-Edwards and defense counsel of record, was left to present the claims of patent invalidity without having prac-

ticed patent law, without having had significant previous involvement in this litigation, and with little time to prepare for the trial. Mr. Bisnoff sought postponement of trial of the patent issues until after resolution of the antitrust issues, but this motion was denied by Judge Dooling in light of the direction of this court on the prior appeal, 443 F.2d at 874, 884, induced by Carter-Wallace's expressed fears as to inability to collect damages for continuing infringement, that the trial be conducted expeditiously.

Faced with a situation in which the attorney for a Chapter XI debtor was not proficient in patent law but the patent issue had been explored in depth in a trial of Carter-Wallace's infringement action against the United States before a Commissioner of the Court of Claims, the court permitted an unusual procedure. Most of Carter-Wallace's witnesses appeared in person;[6] they gave substantially the same testimony which they had given in the Court of Claims, except for a few instances where they clarified their positions on matters that had been developed on their cross-examination there. But Davis-Edwards was allowed to offer the Government's cross-examination in the Court of Claims as its cross-examination, and to present its entire case-in-chief through the use of the testimony of the Government's witnesses in the Court of Claims action, with the judge often summarizing the testimony into the record and questioning counsel about it. Similarly, the exhibits presented in the Government's cross-examination and case-in-chief in the Court of Claims were marked into evidence, with the court again often questioning counsel about them.

---

6. Judge Dooling clearly gave Carter-Wallace the right to present *all* its witnesses in person if it so desired. When Davis-Edwards moved early in the trial to have the entire record of the Court of Claims proceeding accepted in evidence, the judge denied the motion, saying:

"Mr. Bisnoff, it would seem to me that I can't require them to try the case on that record, and that they can certain-

ly put in the plaintiff's case as they wish."

And when counsel for the defendant persisted in setting out the grounds for his motion. Judge Dooling cut him off, saying:

"that is his right [to present testimony *viva voce*]. I have ruled. He may put in his case."

Although Carter-Wallace apparently claims that admission of any of this material from the Court of Claims action is patent error warranting summary reversal, the issue can be narrowed rather quickly. We see no possible impropriety in the admission of the exhibits, mostly prior art references and other records whose authenticity is not challenged. Admission of each exhibit was separately considered by Judge Dooling, with full opportunity for Carter-Wallace to object, and Carter-Wallace has not pointed to any specific ruling which it claims to be erroneous. We likewise find little difficulty in the use of the Government's cross-examination in the Court of Claims. Nothing would have prevented counsel for Davis-Edwards from reading the questions the Government had asked and, if the witness gave a different answer, reading into the record as impeachment the response he had previously made in the Court of Claims. Nor can Carter-Wallace object to admission of the cross-examination as substantive evidence rather than impeachment, for Judge Dooling carefully offered it the opportunity to withdraw or modify any of the answers previously given. Moreover, we fail to see how allowing use of the previous cross-examination of its own witnesses could possibly have prejudiced Carter-Wallace. Knowledge that one's witnesses would be asked only the same questions as on a previous trial would seem to be a trial lawyer's dream; indeed, Carter-Wallace freely admitted that its witnesses had modified their direct testimony so as to "clarify" problems explored by the Government's cross-examination.

The issue is thus confined to the propriety of the receipt by the district court of the testimony of the Government's witnesses in the Court of Claims as defendant's case-in-chief in this action. It is highly debatable whether Carter-Wallace made a sufficient objection to the use of this testimony.[7] However, we think that the substantial question raised warrants futher discussion and, in light of our view of the merits of this question, we see no reason to rely solely on our doubts over the sufficiency of plaintiff's objection.

Davis-Edwards contends that the use of the testimony of the Government's witnesses in the prior action met the three essentials to the use of previous testimony, namely, (1) that the prior proceeding must have involved substantially the same issue; (2) that the party against whom the testimony is sought to be used (or someone having a similar interest) had a fair opportunity and adequate motive to cross-examine the witness; and (3) that the witness is unavailable. See McCormick, Evidence §§ 255–57 (Cleary ed. 1972). The first two conditions were clearly met here. Davis-Edwards claims that the third requirement was satisfied by evidence that none of the witnesses lived within the reach of the court's subpoena power un-

---

7. Carter-Wallace's only objection on hearsay grounds to the introduction of testimony from the Court of Claims record came at the beginning of the trial, when defendant moved the court to accept the entire record of the Court of Claims action. This objection was *sustained* by the court so as to allow the plaintiff to present its case as it wished. The court ruled, however, that the defendant could renew its motion when it was time to present its case, at which time the plaintiff might "feel differently . . . [and] not even oppose your motion to put in some parts or all of the Court of Claims record as your defense." Carter-Wallace's only other objection during the course of the trial came when Davis-Edwards sought to introduce the Government's cross-examination of Carter's first witness. This objection was limited to the alleged immateriality of much of this cross-examination and the delay and confusion that its admission would produce. No objection on hearsay grounds to the use of the cross-examination was made; in any event, as we have held above, any such objection would not have been meritorious. Most important, Carter-Wallace did not object at all, despite many opportunities to do so, at the critical point when Davis-Edwards introduced the testimony of the Government's witnesses in the Court of Claims as its defense.

der F.R.Civ.P. 45(e). Certainly the general rule is that lack of power of the court to compel attendance at trial is sufficient proof of unavailability. See McCormick, *supra*, § 253, at 609; 5 Wigmore, Evidence § 1404 (3d ed. 1940). But Carter-Wallace argues that this principle does not apply "to expert witnesses whose opinions could under no circumstances be obtained through court process."

■■■ Carter-Wallace's reliance on the court's alleged lack of power to compel expert testimony is misplaced. The weight of authority holds that, although it is not the usual practice, a court does have the power to subpoena an expert witness and, though it cannot require him to conduct any examinations or experiments to prepare himself for trial, it can require him to state whatever opinions he may have previously formed. Boynton v. R. J. Reynolds Tobacco Co., 36 F.Supp. 593 (D.Mass.1941); United States v. 284,392 Square Feet of Floor Space, 203 F.Supp. 75 (E.D.N.Y.1962) (dictum); see 4 Moore, Federal Practice ¶ 26.66 [1], at 26–469 (1972); 8 Wigmore, *supra*, § 2203(2)(c). Since the witnesses involved here had previously testified as to their opinions, it would seem that they could have been subpoenaed to repeat their testimony here. In any event, even if Carter-Wallace were correct that a court cannot require expert witnesses to appear, this argument would seem to lead to the conclusion that an expert witness is "unavailable" even if he is within the 100 mile radius of the court's usual subpoena powers, rather than to the result Carter-Wallace seeks.

■■■ Still, we agree there is something unusual about the use of the prior testimony of an expert witness that calls for further scrutiny of his unavailability. First, unlike the typical witness whose involvement with the case may depend on the fortuity of his observing a particular event and whose presence at trial is often involuntary, a party ordinarily has the opportunity to choose the expert witness whose testimony he desires and invariably arranges for his presence privately, by mutual agreement, and for a fee. Although a requirement of an attempt to secure the voluntary attendance of a witness who lives beyond the subpoena power of the court is not ordinarily imposed before prior testimony can be used in civil litigation, see 5 Wigmore, *supra*, § 1404; Barber v. Page, 390 U.S. 719, 723, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968), we think that such a requirement is particularly appropriate when dealing with the testimony of expert witnesses whose earlier attendance is almost invariably secured by such voluntary arrangements.

■■■ Moreover, even the unavailability of a particular expert witness should not without more allow the use of his prior testimony in a second action. It must be recognized that the general preference of the federal rules, as expressed in F.R.Civ.P. 43(a), is for oral testimony so that there will be an opportunity for live cross-examination and observation of the demeanor of the witness. While the use of previous testimony is a well-established exception to this rule, it is an exception based on the necessity of using the prior testimony when the alternative is loss of that testimony entirely. See 5 Wigmore, *supra*, § 1402, at 148. When the ordinary witness is unavailable, his unique knowledge of the facts will be lost unless the use of his prior testimony is allowed. But the expert witness generally has no knowledge of the *facts* of the case. Instead, he is called upon to express a professional opinion upon the facts as they are presented to him, often expressing his opinions in the form of answers to hypothetical questions. Thus, even if one particular expert is unavailable, there is no need to use his previous testimony to prevent the loss of evidence, because there will usually be other experts available to give similar testimony orally. It seems to us, therefore, that before the former testimony of an expert witness can be used, there should be some showing not only that the witness is unavailable, but that no other expert of similar

qualifications is available or that the unavailable expert has some unique testimony to contribute.

Although there has been no showing here that attempts were made to secure the voluntary attendance of the Government's witnesses in the Court of Claims or that there were no other witnesses who could have provided the same information, we do not believe that reversal is warranted in the circumstances of this case.[8] Undoubtedly one reason that there was no such showing was Carter-Wallace's failure to press its objection in sufficient detail to force Davis-Edwards to go beyond its proof that the witnesses all resided beyond the 100 mile limit, see note 7 *supra*. Second, if Judge Dooling had been aware of the requirements we have set out above, we do not think it would have been an abuse of discretion to admit the the prior testimony on a showing that Davis-Edwards' insolvency made any attempt to secure the voluntary appearance of these witnesses futile. Moreover, it seems likely that the Government's pharmacology expert, Dr. O'Leary, who testified at length on the obviousness of meprobamate and who was by far the most important of the witnesses whose testimony is in ques-

tion, would have been found to be an "unavailable expert. [who] has some unique testimony to contribute," *supra*, since his doctoral dissertation, written at about the same time as the discovery of meprobamate, involved a study of the relevant prior art and the testing of new compounds in a search for meprobamate-like properties. Dr. O'Leary's failure to suggest meprobamate in his thesis formed the basis of extensive cross-examination in the Court of Claims and is one of the prime arguments of Carter-Wallace in favor of the non-obviousness of the drug.

Most important, however, Carter-Wallace has failed to show that it has been prejudiced by the use of the Court of Claims testimony. Carter-Wallace knew from the beginning of the trial that Davis-Edwards would rely on the previous testimony and had the rare opportunity to tailor its case to the defense that would be presented. The only instance of possible prejudice to which Carter-Wallace points was the judge's inability to observe the alleged breakdown of Dr. O'Leary when, in the hearing before the Commissioner of the Court of Claims, he was confronted with his doctoral dissertation. We cannot be-

---

8. Davis-Edwards argues that the prior testimony is admissible under the laws of New York, which, if true, would be an alternative ground for holding it admissible in this action. F.R.Civ.P. 43(a). Defendant relies on N.Y.Civ.Prac.Law § 4517 (McKinney supp. 1972), which states in relevant part:

> In a civil action, if a witness' testimony is not available because of . . . absence beyond the jurisdiction of the court to compel apearance by its process . . . his testimony, taken or introduced in evidence at a former trial . . . may be introduced in evidence by any party upon any trial of the same subject-matter in the same or another action between the same parties . . . .

The requirement that the action be between the same parties has been held to mean only that the party against whom it is sought to introduce the testimony is the same as the party against whom the evidence was first introduced. Healy v. Rennert, 9 N.Y.2d 202, 213 N.Y.S.2d

44, 173 N.E.2d 777 (1961). Defendant's argument is further bolstered by an apparently long-forgotten decision of the Appellate Division of the New York Supreme Court, Wallach v. Manhattan Ry., 105 App.Div. 422, 94 N.Y.S. 574 (1st Dep't 1905), which holds that a party can use the former testimony of a now-deceased expert witness notwithstanding the availability of other experts. But there is a suggestion in the New York case law that before the prior testimony of an unavailable witness can be used there must be some showing of efforts to secure his voluntary attendance, Longacre v. Yonkers R.R., 191 App.Div. 770, 182 N.Y.S. 373 (2d Dep't 1920), and there has been no consideration whether this requirement is particularly appropriate when expert testimony is involved. Since this hurdle is one that must be surmounted even under New York law, we prefer to rest our holding on grounds more generally applicable to the federal courts.

lieve that this would have altered the result, especially since the trier of fact was a sophisticated judge, having many years of trial experience at the bar and on the bench, whose opinion and questions during trial reveal an extraordinary understanding of this esoteric subject matter.

We would not wish to be understood as thinking, any more than did the district judge, that the procedure followed below was a model, or even a desirable, form for the trial of a patent case. But the judge was confronted with a difficult problem and solved it in a way we cannot find to have been defective. To be sure, it would have been better if the issue of validity had been first decided by the Court of Claims, whose commissioner had seen and heard the witnesses, and we do not view with favor the efforts the Government is said to have made to avoid this. But, as on the issue of mootness, Carter-Wallace's discomfiture is largely of its own making, arising from its determination to press its claim for infringement against this insolvent infringer, with little prospect of any monetary gain, despite the red flags raised in our previous opinion, rather than await the decision of the Court of Claims.

Carter-Wallace urges us to consider the collateral estoppel effect that will attach to a finding of invalidity by this court, see Blonder-Tongue Laboratories, Inc. v. University of Illinois Foundation, *supra*, 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 and the requirement that the patentee have "a fair opportunity procedurally, substantively and evidentially to pursue his claim the first time." 402 U.S. at 333, 91 S.Ct. at 1445. Decision whether the unorthodox form of the trial should deprive the judgment of effect as collateral estoppel is more appropriately a matter for courts where such effect is asserted.

### III. *Validity of the Meprobamate Patent*

We therefore turn to the merits. In view of the elaborate statement of the facts by the district court, we can greatly abbreviate our own. The parent application, filed on July 29, 1950, was, as Judge Dooling stated, "simplicity itself," 341 F.Supp. at 1313. The application sought patents on a class of organic compounds as new compositions of matter. As said by the district court, *id.*:

> The invention was described as propanediol dicarbamates, that is, 1,3-propanediol dicarbamates with disubstitution of alkyl or aryl radicals having one to six carbon atoms at the middle carbon of the propane chain. The disubstituted radicals can be the same or different ones. So far as properties and implied uses were concerned, the application said simply "we have discovered that the 2,2-disubstituted-1,3-propanediol dicarbamates of the invention possessed marked anticonvulsant properties."

Example 6 of the application detailed the preparation of 2-methyl-2-n-propyl-1,3-propanediol dicarbamate, the compound at issue here.

The prosecution of the application took the familiar course of rejection by the Examiner, submission of arguments and affidavits, and, in this instance, a final rejection on March 12, 1953. A continuation-in-part (CIP) application was filed on August 3, 1953. Again we adopt the characterization by the district court, 341 F.Supp. at 1318:

> The new application disclosed and claimed as a group 3 propanediol dicarbamates, 2-methyl-2-isopropyl-1,3-propanediol dicarbamate, 2-ethyl-2-phenyl-1,3-propanediol dicarbamate and 2-methyl-2-n-propyl-1,3-propanediol dicarbamate (meprobamate).
>
> . . . The specification adds to the disclosure of anticonvulsant properties a disclosure of "marked paralyzing action on voluntary muscles," which emphasizes that the paralysis is produced without loss of consciousness or impairment of vital functions, such as respiration and heart action. The discussion indicates that the structure most sensitive to the effects of the

drugs in the central nervous system are the interneurons. The application states that meprobamate is similar to mephenesin in numerous respects but is of much longer duration of action, and is more effective in oral administration; without explicitly saying that meprobamate shares all of such uses, it is then said that mephenesin is widely used "in the treatment of muscle spasm, anxiety and many disorders of the nervous system."

The patent issued on the CIP application on November 22, 1955.·

If the case hinged solely on whether it was obvious "to a person having ordinary skill in the art to which said subject matter pertains," 35 U.S.C. § 103, that nature would permit the arrangement of atoms comprising meprobamate and that chemists could synthesize the compound, the answer would be easy. Although meprobamate was undeniably a new composition of matter, 341 F. Supp. at 1306, the state of the prior art of chemical synthesis was such as to make the compound "chemically obvious," to use Judge Dooling's expression, 341 F.Supp. at 1337. As noted in our earlier opinion, 443 F.2d at 876, the 1,3-propanediol, which has long been known in the art, can be written as

$$HO-CH_2-\overset{\displaystyle H}{\underset{\displaystyle H}{\vphantom{|}C}}-CH_2-OH$$

or as

$$X-CH_2-\overset{\displaystyle R_1}{\underset{\displaystyle R_2}{\vphantom{|}C}}-CH_2-X^1$$

The parent diol of meprobamate, a disubstituted 1,3-propanediol with a methyl group, $CH_3$, substituted for $R_1$, and a normal propyl group, $C_3H_7$, substituted for $R_2$, was first disclosed in a 1913 article in a German journal by Adolf Franke. The diol was brought to the attention of researchers in the art by the work of Dr. Berger just prior to the synthesis of meprobamate. Dr. Berger's 1949 article, which has generally been referred to in this litigation as Berger I, was a study of the pharmacological properties of a group of disubstituted 1,3-propanediols, where the $R_1$ and $R_2$ of the propanediol were replaced by various combinations of ethyl, methyl, propyl, and other related groups; in particular, Berger I reported the pharmacological properties of 2-methyl-2-n-propyl-1,3-propanediol.

The only remaining step in the synthesis of meprobamate was the carbamation of the terminal hydroxyls of the propanediol, that is, the replacement of the X and $X^1$ of the propanediol by carbamate groups, each in the form

$$NH_2-\overset{\displaystyle O}{\overset{\displaystyle \|}{C}}-O.$$

But no one skilled in the art would have doubted the feasibility of doing this. As Judge Dooling observed, 341 F.Supp. at 1337, the propanediols "could be carbamated as countless alkyl moieties had been carbamated" since the early 1900's. More recently, a 1948 British patent issued to William Baird, et al., taught a new process for the synthesis of organic polycarbamates through reaction with phosgene. One of Baird's examples specifically disclosed the carbamation of 1,3-propanediols, and, since the patented process applied to dicarbamation of any such radical, "substituted or not," the Baird patent clearly comprehended the synthesis of meprobamate. Although the Baird process was not explicitly followed in the synthesis of meprobamate by Drs. Berger and Ludwig, the process actually used "appears not to differ radically from the method suggested in the patent," 341 F.Supp. at 1338.

However, the obviousness that such a compound could be made, as thousands of other variants could also be, does not necessarily dispose of the issue. Chemists do not invent new compounds just for fun. As this court has observed in a decision upholding the validity of a patent on a new chemical compound even though the compound was "the end product of a fairly simple series of chemical

reactions," Schering Corp. v. Gilbert, 153 F.2d 428, 431 (2 Cir. 1946), it must be "kept in mind that such things must be evaluated not alone by the degree of the change but also by reference to the purpose sought to be accomplished." 153 F.2d at 432. The Court of Customs and Patent Appeals has similarly rejected the contention that the obvious chemical structure of a new compound should bar patentability as a new composition of matter. In re Papesch, 315 F.2d 381, 50 CCPA 1084 (1963). The doctrine which that court has evolved, as approved by the Court of Appeals for the District of Columbia Circuit in Commissioner of Patents v. Deutsche Gold-und-Silber Scheideanstalt Vormals Roessler, 130 U.S.App.D.C. 95, 397 F.2d 656, 661 (1968), holds that:

> Obvious molecular modification coupled with a showing of novel [or unexpected] properties or superiority of known properties can establish patentability.

■ Davis-Edwards here challenges the validity of this doctrine, and Judge Dooling, in the latter part of his opinion, agreed that it was too liberal a test of patentability, resulting in the grant of patent monopolies exceeding the scope of the actual invention. The court below argued that chemical obviousness should bar patentability of the new compound as a new composition of matter, and that the discovery of novel or unexpected properties should entitle the inventors only to a patent on the uses to be made of these properties. Although Judge Dooling's remarks have been expressly rejected by the Court of Customs and Patent Appeals, see In re Murch, 464 F.2d 1051, 1055 (1972), and have provoked the American Patent Law Association to filing a brief in this court as *amicus curiae*, we find it unnecessary to consider the question he raised. For we hold, as did the court below, that the patent for meprobamate is invalid for

obviousness even under the more liberal standard of *Papesch*.

■ Carter-Wallace asserts that, once this standard is applied, the day is won since, as is in effect conceded, it was not obvious to a person having ordinary skill in the art that the change in molecular structure which resulted in meprobamate would produce one of the most effective tranquilizers the world has known. But the premise does not lead so swiftly to the conclusion. An essential link in the argument, and one that existed in the cases on which Carter-Wallace relies, see Illinois Tool Works, Inc. v. Continental Can Co., 397 F.2d 517, 520 (7 Cir. 1968); Technicon Instruments Corp. v. Coleman Instruments Corp., 385 F.2d 391, 393 (7 Cir. 1967); In re Zenitz, 333 F.2d 924, 52 CCPA 746 (1964), is that the novel, unexpected, or superior nonobvious property must be disclosed in the patent application or at least in supporting documents [9] in order to be relied upon as a basis for patentability. Abbott v. Coe, 71 App.D.C. 195, 109 F.2d 449, 450 (1939); Tinnerman Products, Inc. v. George K. Garrett Co., 292 F.2d 137, 140 (3 Cir.), cert. denied, 368 U.S. 833, 82 S.Ct. 58, 7 L.Ed.2d 35 (1961).

■ Admittedly the initial application made no reference to the utility of meprobamate as a tranquilizer. But this would not be fatal, if the CIP application adequately disclosed this property. It is true that a February, 1952, article by Dr. Berger fully disclosed the synthesis of meprobamate and its anticonvulsant properties. Davis-Edwards argues that this forecloses issuance of a patent on the drug as a new composition of matter if, as it contends, the 1950 application did not establish patentability. But we agree with Judge Rich, In re Kirchner, 305 F.2d 897, 49 CCPA 1234 (1962), that under 35 U.S.C. § 120, the failure of the 1950 application to qualify for patentability would not preclude use of the initial filing date with

---

9. The facts of this case do not require us to determine whether disclosure only in supporting documents is sufficient.

respect to a new property disclosed in a CIP application provided that the original patent application showed the novelty and utility required by § 101, as was the case here. See also Indiana General Corp. v. Lockheed Aircraft Corp., 408 F.2d 294 (9 Cir. 1968). Whatever may be the proper scope of the relation-back doctrine, it surely covers a case where, as here, the only intervening publication —and that by the inventor—disclosed nothing more than the initial patent application.[10]

▪ Carter-Wallace's problem is not the 1952 Berger article but the failure of the CIP application adequately to disclose the tranquilizing property of meprobamate. While the specifications say the patented compounds "possess marked anti-convulsant and other properties," the only other property expressly disclosed is of "a marked paralyzing action on voluntary muscles." Carter-Wallace argues that disclosure of the tranquilizing property is implicit in two other statements in the specifications. First, it points to language where the specifications explain that the compounds overcome the drawback of very short duration of action that had limited

the pharmaceutical utility of mephenesin, which is described as "a widely used drug of value in the treatment of muscle spasm, anxiety and many disorders of the nervous system," and relies heavily on the word "anxiety." Even if we accept for the moment Carter-Wallace's claim—which is disputed by Davis-Edwards—that use in the treatment of anxiety would be a sufficient teaching of tranquilizing properties of the kind possessed by meprobamate, which calms without dulling the senses as opposed to the dulling effect of the sedatives used prior to 1955 in the treatment of anxiety, we are unable to agree that this is a disclosure of meprobamate's tranquilizing property. The specifications do not say that meprobamate shares this property of mephenesin; they merely say that the action of meprobamate "is similar to that of mephenesin in numerous respects," and do not specify in which respects the two drugs are similar or, aside from the difference in duration of action, in which they may differ. We fail to see how this language can be regarded as an adequate disclosure when it is as consistent with the absence of tranquilizing properties as it is with their presence.[11]

10. The court below held that Carter-Wallace could rely only on the disclosure of anticonvulsant utility in the original application as a ground for establishing the non-obviousness of its discovery of meprobamate. So general a ruling would fail to recognize the significance of § 120 and the benefit of the earlier filing date that it accords. Moreover, we find no authority for such a position. The court cited only In re Herr, 304 F.2d 906, 909, 50 CCPA 705 (1962). But the holding in *Herr* was that disclosure of an additional property in an affidavit in support of the application could not be relied upon to establish patentability when the property was not disclosed in the application itself, a holding which, we should note, has been substantially eroded by later decisions of the C.C.P.A., *see* In re Khelghatian, 364 F.2d 870, 53 CCPA 1441 (1966). Importantly, the property upon which reliance was placed was not disclosed in any application; no continuation-in-part application had been filed; and the case did not involve the relation-back of additional disclosures in a CIP

application. Indeed, when the applicant in *Herr* did disclose the additional properties in a new application, the compound was found patentable, with the C.C.P.A. rejecting the argument that the rejection of the initial application foreclosed patentability on grounds of *res judicata*. In re Herr, 377 F.2d 610, 54 CCPA 1315 (1967).

11. Carter-Wallace's argument is somewhat analogous to the argument unsuccessfully advanced by the patent applicant in Brenner v. Manson, 383 U.S. 519, 531–532, 86 S.Ct. 1033, 16 L.Ed.2d 69 (1966). There it was argued that the tumor-inhibiting effects of the compound which was the end-product of the process sought to be patented were sufficiently disclosed by reference to an adjacent homologue which had this property, the argument being that the compound in question would be likely to have similar properties. The Supreme Court upheld the rejection of this argument by the Patent Office and held that utility had not been sufficiently disclosed.

Second, Carter-Wallace points to the statement in the specifications that "[t]he structure most sensitive to the effect of the drugs in the central nervous system are the interneurons." Carter-Wallace explains that the tranquilizing effect of meprobamate follows from its effect on the interneurons because the limbic system and the thalamus of the brain, the centers of human emotion, have relatively large concentrations of interneurons. While this may be a persuasive *post hoc* explanation of meprobamate's tranquilizing action in light of current scientific understanding, it is building too much on too little to claim that the statement in the specifications would have made it apparent to the average worker in the art at the time that meprobamate was an effective tranquilizer. Perhaps the best refutation of Carter-Wallace's argument is contained in the next sentence of the specifications: "This [effect on the interneurons] may be of therapeutic value." How can it be seriously contended that the tranquilizing effect of meprobamate would be clear from the disclosure of its effect on the interneurons when the inventors themselves were uncertain whether or not this effect was of therapeutic value and were unable to state what that therapeutic value might be? On the other hand, if the inventors were aware of the drug's tranquilizing properties,[12] such vague disclosure would be inexcusable.

Even if we were willing to agree that meprobamate's tranquilizing properties were "intimated" in the specifications, as the district court suggested, 341 F. Supp. at 1322, so limited a disclosure would not be adequate to justify issuance of a patent on the basis of these properties. The trade-off made in the patent laws is the grant of a 17-year monopoly in return for a non-obvious invention coupled with a specification "in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains . . . to make and use the same." 35 U.S.C. § 112. Although the primary purposes of requiring this degree of disclosure may be to insure that the invention can be reconstructed and that the boundary separating legitimate experimentation from infringement is clear, see Norton Co. v. Bendix Corp., 449 F.2d 553, 555 (2 Cir. 1971), both of which are fulfilled here, similar reasoning justifies a high standard of disclosure when a property of an obvious chemical compound is relied upon to establish patentability under the *Papesch* doctrine. In the absence of such disclosure the public will not obtain the benefit of the particular use which justified the grant of the patent. Applying this standard, we conclude that nothing in the specifications of the CIP application would have led the typical skilled worker in the art to use meprobamate as a tranquilizer.

However, our refusal to accept Carter-Wallace's argument as to the disclosure in the CIP application does not end the case in Davis-Edwards' favor. All we have established up to this point is that the synthesis of meprobamate was chemically obvious and that, assuming *arguendo* that the *Papesch* doctrine of establishing patentability on the basis of unexpected properties provides a proper standard, Carter-Wallace nevertheless cannot take advantage of the compound's property as a tranquilizer in support of

---

12. Dr. Berger testified that the tranquilizing properties of meprobamate were discovered through experiments with Java and rhesus monkeys in July, 1952. After administration of meprobamate, these monkeys, normally quite aggressive and difficult to handle, were markedly more docile. In contrast to their usual behavior, they could be handled without biting, and would accept food from humans and eat it peacefully in front of observers. If this is so, there is no reason why Dr. Berger could not have amended the patent application to add the tranquilizing property and specify the results of his experiments before the rejection in March, 1953, or included this information in the August, 1953, CIP application. Though we can only speculate as to the reason, the simple fact is that he did not.

patentability because of the lack of adequate disclosure. There remains the question whether the utility of meprobamate as an anticonvulsant and muscle-paralyzant, clearly disclosed in the CIP application, was obvious as that term is used in § 103.

Although the issue is by no means free from doubt, we have concluded that the revelant prior art had progressed to such a point—in no small part through the efforts of Dr. Berger before his retention by Carter-Wallace— that the development of meprobamate as an anticonvulsant and paralyzant was "obvious . . . to a person having ordinary skill in the art," 35 U.S.C. § 103. There is, of course, a conceptual difficulty in applying that time-worn phrase to an art so abstruse as this. Judge Medina spoke to the problem when he said in Indiana General Corp. v. Krystinel Corp., 421 F.2d 1023, 1030–1031 (2 Cir.), cert. denied, 398 U.S. 928, 90 S.Ct. 1820, 26 L.Ed.2d 91 (1970), that "experimentation is of the essence of the art involved in this lawsuit" since "the practitioners of· this art are, and of necessity must be highly educated, sophisticated persons who generally have at their disposal laboratory facilities and staffs of competent assistants." In such an art a development cannot be regarded as unobvious simply because it was not the first, or even the second or third, structural change of which a researcher would think. On the other hand, a development should not be regarded as obvious merely because it lay somewhere along the general stream of the prior art, although years of labor might be needed to achieve it. "[T]he inspiration-perspiration process of the laboratory," Eli Lilly & Co. v. Generix Drug Sales, Inc., 460 F.2d 1096, 1103 (5 Cir. 1972), is as deserving of reward as the flash of genius, and surely more so than dumb luck. Where to draw the line between these extremes is among the most unrewarding of judicial tasks, nec-

essary though it be. It is largely, as Judge L. Hand said, "to substitute our ignorance for the acquaintance with the subject of those who were familiar with it," Reiner v. I. Leon Co., 285 F.2d 501, 504 (2 Cir. 1960), and to do this—no matter how hard we try to resist—with the bias afforded by the brilliance of hindsight.

We start from the fact that at least since Dr. Berger's study of the properties of mephenesin, a substituted 1,2-propanediol, in 1946, it was known that propane derivatives had anticonvulsant and muscle-paralyzant effects. The practical utility of mephenesin, however, was severely limited, as previously noted, by its very short duration of action. As Dr. Berger testified, "the discovery of meprobamate was the product of a prolonged and determined search for a product that would have essentially the properties which he found in mephenesin, but would have them in a higher degree, and would be effective over a longer period after administration." 173 U.S. P.Q. at 77.

This search was significantly advanced by Dr. Berger's first 1949 article, entitled "Anticonvulsant Action of 2-Substituted-1,3-Propanediols." After referring to the paralyzing and anticonvulsant properties of mephenesin, he explained that his earlier published research "suggested the examination of the anticonvulsant properties of 2-substituted-1,3-propanediols." The results of Dr. Berger's examination were very encouraging. He reported that the 2,2-diethyl-1,3-propanediol, called DEP,[13] possessed outstanding anticonvulsant properties. He also found that several other of the disubstituted 1,3-propanediols had anticonvulsant activity on the order of that of mephenesin. Particularly relevant for present purposes is Dr. Berger's finding that the 2-methyl-2-n-propyl-1,3-propanediol, the parent diol of meprobamate, was also more effective as an anticonvulsant than mephenesin, re-

13. In terms of the second diagram above, DEP is synthesized through substitution of ethyl radicals, each in the form $C_2H_5$, for both $R_1$ and $R_2$, leaving the terminal hydroxyls unchanged.

quiring the lowest mean protective dose, except for the 2,2-diethyl-1,3-propanediol, to protect against convulsions induced by metrazol. Dr. Berger's stated conclusion was that DEP and other substituted 1,3-propanediols possessed pharmacological properties similar to mephenesin although having a weaker paralyzing and more powerful anticonvulsant action.

Still, the disubstituted 1,3-propanediols of Berger I shared the major drawback of mephenesin, for they too were of quite limited duration of action. But another 1949 article by Dr. Berger (with Richard F. Riley), which has been generally referred to in this litigation as Berger II, carried the matter further. It suggested that the relatively short duration of mephenesin might be due to the rapid oxidation of the terminal hydroxyl and that consequently it might be desirable to protect the group involved by esterification. Accordingly, a sample ester, mephenesin acid succinate, was prepared and tested. The test results seemed to confirm Dr. Berger's theory. The mephenesin acid succinate shared the anticonvulsant and muscle-paralyzant action of its parent diol, though this action was less intense. Most important, the succinate ester did indeed have a longer duration of action than the diol. As Dr. Berger concluded, "[t]he study of other organic esters of [mephenesin] therefore appears warranted."

The suggestion of the prior art that esterification might be the answer to the short duration of action of mephenesin and the disubstituted 1,3-propanediols was greatly strengthened by an article by Hine, Christensen, Murphy and Davis, also published in 1949. This article was in part a study of the effects of esterification on muscle-paralyzant activity. Although Hine, et al., concluded that "[e]sterification of the free hydroxy groups had a varying effect on potency," the article was "pointed in its insistence," 173 U.S.P.Q. at 83, that "[t]he outstanding effect of esterification was the increase in the duration of paralyzing activity."

The prior art had thus placed the disubstituted 1,3-propanediols high on the list of anticonvulsants and paralyzants with effectiveness greater than or equal to mephenesin, and had ranked the parent diol of meprobamate second among these propanediols. Clearly further experimentation with these compounds was indicated. Moreover, the prior art had strongly suggested esterification as an effective method for protecting the terminal hydroxyls of the 1,3-propanediols from too rapid oxidation in the system and thus prolonging the duration of action of the compounds.

Carter-Wallace correctly points out, however, that there are hundreds of esters other than carbamates that might have been tried in an attempt to prolong the duration of action of the parent diols, and that therefore the prior art suggestion of "esterification" does not, without more, lead to the carbamation of the diols and thus to meprobamate. But at this point the long history of central nervous system (CNS) depressant effects associated with numerous carbamate compounds becomes relevant. Paul Binet in 1893 had reported the CNS depressant effects of urethane, or ethyl carbamate. This report, together with the observations of Mies in 1924, indicated that urethane had anticonvulsant and muscle-paralyzant effects. A 1900 German patent disclosed Hedonal, or methyl-n-propyl carbinol carbamate, as a CNS depressant, and a 1948 study by Spielman found that Hedonal had significant anticonvulsant properties. Similarly, a 1912 United States patent issued to Thron taught that emylcamate, or 1-ethyl-1-methyl propyl carbamate, had CNS depressant effects; testing after the discovery of meprobamate confirmed that it too had anticonvulsant and muscle-paralyzant action.

But the prior carbamate art taught more than the mere fact that these carbamate compounds had CNS depressant effects. As Judge Dooling found, 341 F.Supp. at 1309, there was a consciousness from the beginning of the cited prior art, particularly in Binet's 1893

article, that union of a carbamate with another moiety which independently evinces a CNS depressant effect "might in some way contribute to a whole CNS depressant effect." Thus, the carbamate prior art certainly lent credence to the statement of Dr. O'Leary, the defendant's expert witness, that a researcher interested in esterification would be "most interested" in the carbamate esters.

Carter-Wallace argues that in fact this carbamate prior art led away from the selection of the carbamate ester in efforts to prolong the effectiveness of the 1,3-propanediols. The early writings did not distinguish anticonvulsant, muscle-paralyzant, and other selective CNS depressant properties. Instead, the carbamates were described as possessing sedative-hypnotic action, then a broad term embracing what are now perceived as a wide range of specific CNS depressant effects. The anticonvulsant and muscle-paralyzant effects described in the early writings thus appeared to be mere side effects of large dosage of consciousness-dulling sedatives. Since these sedative-hypnotic properties would be undesirable in an ideal anticonvulsant or muscle-paralyzant, see 341 F.Supp. at 1310-1311, and since researchers would be unwilling to risk introducing these properties into the relatively selective action of the propanediols, Carter-Wallace argues that the prior art effectively ruled out the choice of the carbamate ester.

Judge Dooling rejected this conclusion that Carter-Wallace reaches, and instead took a position midway between the poles advanced by the experts of the parties. He found, 341 F.Supp. at 1311–1312, that although "it is not possible to say that the state of the art was such as to make carbamate esterification of the propanediols of Berger I the preeminent suggestion of the art or the evident first choice of the investigator interested in improved and prolonged mephenesin-like properties," still "[c]arbamate esterification of substituted propanediols was

among the suggestions with which the prior art was enriched."

■■■ There is ample evidence to support this finding. The district court was entitled to give weight to the testimony presented by Davis-Edwards which indicated that the chance that the general CNS depressant effects of the carbamates would enhance the activity of the parent diols justified the risk that carbamation would introduce undesirable side effects. Equally important is the objective evidence in the record which clearly shows that researchers in the art had *not* ruled out the carbamates. A group of men at the Squibb Institute for Medical Research had also been working in this field at about the same time as Dr. Berger; indeed, they had supplied Dr. Berger with some of the disubstituted 1,3-propanediols on which he had based his 1949 article. In a pair of 1950 articles referred to in this litigation as Yale I and Yale II, both conceded to be prior art on the issue of obviousness, the Squibb group reported the synthesis of both mephenesin monocarbamate and DEP monocarbamate, among others, in a search for compounds with muscle-paralyzant activity. Thus, we conclude that the prior art pointed sufficiently in the direction of dicarbamation of the disubstituted 1,3-propanediols that the development of meprobamate was obvious in 1950 to persons having ordinary skill in this extraordinary art.

Carter-Wallace advances a number of arguments in an unpersuasive attempt to show that the properties of meprobamate were sufficiently unexpected to make the compound patentable under the *Papesch* approach. First, it argues that the properties of meprobamate were unexpected because predictions of pharmacological activity from chemical structure are simply not meaningful in this area, pointing to a number of carbamate esters of substituted propanediols which are not active anticonvulsants or muscle-relaxants. While this may be generally true, the conclusion that meprobamate would be likely to have anticonvulsant and muscle-paralyzant activity of long

duration was far more than a mere prediction from its chemical structure. It was rather the result of a specific suggestion of the prior art of a solution for the troublesome short duration of prior art compounds, a suggestion based not on abstract reasoning from chemical structure but on a persuasive theoretical explanation of *why* longer duration of action could be expected. That a number of carbamate esters lack anticonvulsant activity does not change the conclusion that carbamate esterification of the propanediols was an obvious step. The experimentation which is the essence of this art need not require a guarantee of success before a step can be obvious; in any event, the fact is that quite a few of the carbamate esters of the propanediols did reveal the expected longer duration of action of pharmacological activity.

Carter-Wallace also argues that even if meprobamate's increased duration of action over its parent diol could have been predicted, its superior pharmacological intensity was unexpected and establishes the compound's patentability. The 1949 article of Hine *et al.*, however, had reported that esterification "had a varying effect on potency. In some instances it was increased, while in others it was decreased." Moreover, the carbamate prior art had suggested that carbamation might contribute to the CNS depressant activity of the propanediol. Thus, although meprobamate has approximately twice the pharmacological strength of its parent diol, this result is hardly so far out of the range of results that could have been contemplated by researchers as to warrant patentability. As Judge Dooling found, 341 F.Supp. at 1335, the anticonvulsant and muscle-paralyzant activity of meprobamate "was [not] significantly different from that

of the prior art products that were structurally related. The kind of anticonvulsant [and muscle-paralyzant] activity is unchanged, the increment in intensity is not startling, and it appears to dissipate over time in a way that suggests a quantitative effect rather than an alteration in mode of activity." [14]

The final contrary argument proffered by Carter-Wallace is the failure of other interested parties to take the step required to discover meprobamate, a factor which, we should note, the Supreme Court has characterized as a "secondary consideration," Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 15 L.Ed. 2d 545 (1966). Particular reference is made to the failure of the Squibb group, and of Dr. O'Leary, whose doctoral dissertation at the University of Rochester subsequent to Dr. Berger's departure found nothing, after two years of work, which constituted an improvement over mephenesin or DEP.

One answer is that this is not a case where the directly relevant prior art was old and there had been long and unsuccessful struggles to meet the unfilled need. As the district court said, 341 F.Supp. at 1335, "here the argument . . . is all but completely forestalled by the appearance at the last moment" of much of the relevant prior art. The two Berger articles and the Hine article were published in 1949; the two Yale articles were published in 1950; meprobamate was discovered in July, 1950. Compare Graham v. John Deere Co., *supra*, 383 U.S. at 36, 86 S.Ct. 684 (where the gap was four years), with Schering Corp. v. Gilbert, *supra*, 153 F.2d at 431 (nineteen years). Another point, particularly relevant to Squibb, is that the prospect of developing a commercially successful anticonvulsant and paralyzant

---

14. Carter-Wallace also argues that the properties of meprobamate were unexpected because, unlike prior art anticonvulsants, it acts selectively without dulling the senses. The proper comparison, however, is not to the prior art anticonvulsants, but to the parent diol of meprobamate. The diol was known to have selective mephenesin-like properties and Dr. Berger's work with mephenesin acid succinate had indicated that esters would share the selective properties of their parent diols. Although there may have been some possibility that carbamate esterification would destroy this selectivity, it is hardly sufficiently unexpected that it did not.

from the substituted propanediols under study was not as alluring as Carter-Wallace would make it seem. Meprobamate did not fill any long-felt need as an anticonvulsant. Phenobarbital, for example, an accepted prior art anticonvulsant, has both a longer duration of action and a far greater intensity than meprobamate. Meprobamate has found only a very limited utility as an anticonvulsant, in the treatment of petit mal epilepsy and tetanus. If Squibb had had any inkling that the various propanediols it prepared for Berger had utility as a tranquilizer, its failure to move forward would indeed be significant. But it had none, and neither did Berger at the time of the invention.

As for Dr. O'Leary, his thesis was only a study of the compounds available to him, most of which were provided by the Squibb group. He did not synthesize any compounds, nor did he in any way direct the design of the compounds provided to him by Squibb. Moreover, the primary purpose of his thesis was to learn the methodology of pharmacological testing. The limited purpose of the thesis obviously influenced the research he did; while he consulted much of the prior art, his bibliography shows no awareness of the articles of the Squibb group or of Hine or of the early carbamate art. Thus, we see nothing in the failure of the Squibb group or Dr. O'Leary which alters our conclusion that meprobamate was obvious as an anticonvulsant and muscle-paralyzant. In light of this holding, we are not required to pass on other objections raised by Davis-Edwards, notably, that the patent contains a claim known to be invalid at the time the CIP application was filed and which has still not been disclaimed, and that Carter-Wallace breached its duty to disclose relevant prior art to the Patent Office.

The judgment that claim 4 of the patent is invalid is affirmed.

## ON PETITION FOR REHEARING

Carter-Wallace has petitioned this court for reconsideration of our decision of November 14, 1972, p. 529, holding its patent on the drug meprobamate to be invalid. It argued that our ruling that the patent application failed to disclose meprobamate's tranquilizing properties, and therefore that those properties could not be considered in assessing the validity of the patent, at 540–543, was a finding of fact on an issue which the district court, because of its differing view of the applicable law, had not considered and on which no expert testimony had been presented. It asked that the case be remanded to the district court to take further evidence and make findings on what it contends to be this newly determinative issue. We called upon appellee to answer. After careful consideration, we find no infirmity in our decision.

The adequacy of a patent application's disclosure is a mixed question of law and fact, on which the court must ultimately apply a legal standard to a complex set of facts. There can be no doubt that expert testimony will often aid in understanding the underlying factual context. But the resolution of the legal issue is for the court, Minnesota Mining & Mfg. Co. v. Carborundum Co., 155 F.2d 746, 749 (3 Cir. 1946); Watson v. Bersworth, 102 U.S. App.D.C. 187, 251 F.2d 898, 900, cert. denied, 356 U.S. 972, 78 S.Ct. 1135, 2 L.Ed.2d 1146 (1958), and when it is clear that the disclosure of the patent application does not meet the statutory standard, expert assistance is not necessary either in the district court or on review. Cf. Kohn v. Eimer, 265 F. 900, 902 (2 Cir. 1920).

That is the case here. This issue was fully briefed by both parties and we had the benefit of Judge Dooling's exhaustive findings of fact, 341 F.Supp. 1303, based in large part on expert testimony concerning the relevant chemical concepts, in reaching our decision. We saw then, and we see now, no need for a remand. There is simply no room for plausible argument that the tranquilizing property of meprobamate was disclosed in the patent application in accordance with the

standard set out in section 112. Carter-Wallace relied only on the anticonvulsant and muscle-paralyzant properties of meprobamate to establish patentability before the Patent Office, did not urge the tranquilizing property as an additional basis of patentability, and did not establish this property as it would have been obliged to do if it had relied upon it. It is apparent that neither of the Patent Examiners—who possessed considerable expertise in this field and were under a statutory obligation to conduct an independent examination of the merits of the application—understood the application to disclose the drug's tranquilizing effect. At no point in the Patent Office proceedings was the tranquilizing property mentioned. At no point did the Patent Office have the opportunity to evaluate what is now claimed to be this basis of patentability against the relevant prior art.

Moreover, correspondence cited by Davis-Edwards lends support to its argument that Dr. Berger himself regarded the CIP application as disclosing only anticonvulsant and muscle-paralyzant properties. His letter to Carter-Wallace's patent counsel, on which the CIP application was largely based, made no mention of the drug's use in the treatment of anxiety. In light of this correspondence, and the fact that meprobamate's effect on the interneurons is as relevant to its muscle-relaxant or muscle-paralyzant property as it is to the tranquilizing property, we are convinced that the few sentences on which Carter-Wallace bases its argument of disclosure were intended as, and were understood as, part of the patent's discussion of meprobamate's muscle-relaxant property.

Indeed, the petition for rehearing does not claim that there is anything in the patent application which clearly teaches meprobamate's tranquilizing properties. Instead, Carter-Wallace suggests that some skilled workers in the art might have been led to experiment with meprobamate as a tranquilizer on the basis of the application's reference to "anxiety" and its disclosure of meprobamate's longer duration of action. But this is not sufficient. We reiterate that a high standard of disclosure is required before a novel property of an otherwise obvious chemical compound can be relied upon to establish patentability. A disclosure is not adequate if it is merely a suggestion of the art which might lead others to hit upon the property relied upon for patentability. The disclosure of a patent should, upon issuance, immediately add a patentable invention to the existing fund of knowledge in the field; it must do more than merely suggest experimentation which would lead to the discovery of the patentable property.

This is not new law; this court has said much the same thing many times before. Thus, in Harries v. Air King Products Co., 183 F.2d 158 (2 Cir. 1950), we held that the patented invention was limited to the disclosure of radio vacuum tubes which utilized an electron stream of comparatively great length, and that the patent did not cover tubes in which the ratio of the length of the electron stream to its cross-section was large, notwithstanding the patentee's argument that this latter property was implicitly disclosed in the text and diagrams of the patent application. Judge Learned Hand's words are in point here:

> Even though it were possible that a person skilled in the art might see that it was not absolute length, but the ratio of length to cross-section that was important, we should not be justified in validating such an expansion of the original; it is the sort of artful extrapolation against which courts have over and over set their faces. . . . A patent must be a certain guide; not a congeries of pregnant suggestions.

Similarly, the Court of Customs and Patent Appeals has long followed the rule of Brand v. Thomas, 96 F.2d 301, 303, 25 CCPA 1053 (1938):

> Lack of clear disclosure is not supplied by a speculation as to what one skilled in the art might do or might not do if

he followed the teaching of the inventor. The disclosure should be clearer than to suggest that one skilled in the art *might* construct the device in a particular manner.

We see nothing in the decisions of the District Court of the Southern District of New York or of this court in a previous litigation involving the meprobamate patent, Carter-Wallace, Inc. v. Riverton Laboratories, Inc., 304 F.Supp. 357 (S.D.N.Y.1969), aff'd, 433 F.2d 1034 (2 Cir. 1970), which is inconsistent with our conclusion. While Carter-Wallace relies on statements of both courts seeming to accept that the tranquilizing properties of meprobamate had been disclosed, see 304 F.Supp. at 361; 433 F. 2d at 1040, in neither court was there dispute that these properties had been disclosed. It is thus neither surprising nor significant that these courts mentioned in passing Carter-Wallace's characterization of the disclosure of the patent application; it is more significant that this court, in its description of the continuation in part application, 433 F. 2d at 1036, noted only the disclosure of anticonvulsant and muscle-paralyzant properties. Carter-Wallace also points to a statement by the district judge in *Riverton* which it claims "excused" the failure of the patent application to specify meprobamate's tranquilizing properties on the ground that human testing had not been completed and therefore "[n]o positive representation of such use could have been made at that time." 304 F.Supp. at 365. But this statement was made in the context of Riverton's claim that the failure to disclose that the drug was intended for human use was a fraud on the patent office which made the patent invalid. Judge Cannella merely held that the failure to disclose "such [intended human] use" was not fraudulent; no question of the adequacy of the disclosure for purposes of patentability was presented, nor was the question of disclosure of tranquilizing properties in particular at issue. At most, Judge Cannella's remark might be construed as indicating his belief that

no "positive representation" of human use could have been expected at that time. But this would not excuse the failure to disclose meprobamate's tranquilizing property; in any event, a reasonable excuse for failing to make a disclosure is not the equivalent of making one.

The petition for rehearing is denied.